533 A.2d 916

**In re Formal Inquiry Concerning Judge Jack R. TURNEY.**

**Judicial Disabilities No. 1,**
**Sept. Term, 1987.**

Court of Appeals of Maryland.

Dec. 8, 1987.

M. Albert Figinski, Baltimore, for Judge Jack R. Turney.

John H. Tisdale, Frederick, for the Com'n on Judicial Disabilities.

Argued before ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and BLACKWELL, JJ., and CHARLES E. ORTH, JR., Associate Judge of the Court of Appeals of Maryland (retired), specially assigned.

McAULIFFE, Judge.

We here consider the report and recommendation of the Commission on Judicial Disabilities concerning Judge Jack

R. Turney, a judge of the District Court of Maryland. The Commission found that Judge Turney is a capable, intelligent, fair, and highly respected jurist in Garrett County, but that his failure in a particular case to avoid the appearance of impropriety warrants censure. We agree.

Judge Turney erred in his handling of a case involving a charge of possession of a fictitious motor vehicle license.[1] What might ordinarily have been a routine matter was in this instance complicated by the direct involvement of the stepson of Judge Turney's former wife, the indirect involvement of the judge's son, and an incorrect but understandable assumption made by the judge.

In late June of 1986, a wallet was found in Swallow Falls State Park and turned over to Park Ranger Carl Christianson. Ranger Christianson's examination of the wallet disclosed that it belonged to Frederick Leary, and that it contained an apparently fictitious Maryland driver's license.[2] When confronted with the fictitious license, Leary admitted to Ranger Christianson that he had possessed it, and further explained that he had obtained it from Kirk Turney, a longtime friend and the son of Judge Turney. Christianson issued a citation to Leary, charging him with possession of the fictitious license. When Christianson filed the court copy of the citation, he informed the clerk of the District Court for Garrett County that Leary had identified Judge Turney's son as the source of the license. The clerk promptly told Judge Turney of this conversation.

Judge Turney knew Leary, a stepson of the judge's former wife, and knew him to be a close friend of his son, Kirk. Additionally, Judge Turney knew that Kirk had in some manner been involved in the making of fictitious licenses, because he had discovered materials used for that

---

**1.** Md.Code (1977, 1987 Repl.Vol.) § 16–301(k) of the Transportation Article provides that "A person may not possess any fictitious license."

**2.** The license bore a name and photograph of a person other than Leary, and a date of birth evidencing an age of 22 years. The rather crude facsimile license did not bear the State seal.

purpose during an impromptu visit to his son's dormitory residence at the University of Maryland the previous year. On that occasion, Judge Turney became very upset with his son and instructed him to immediately terminate any activity related to fictitious licenses.[3]

Frederick Leary's case came on for trial in the District Court of Maryland at Oakland on September 17, 1986. Judge Turney, who is the sole resident judge for the District Court in Garrett County,[4] was presiding. Judge Turney was not aware that Leary's case was on the docket until he entered the courtroom. When the case was called, Judge Turney addressed Leary by his first name and inquired concerning the nature of the charge. Leary responded, and indicated that he wished to plead guilty. Ranger Christianson then recounted the facts concerning the finding of the wallet, and with respect to Leary's admission he stated, "I asked him about the fictitious license. And he said that one of his college friends had made the license for him, that it was used to purchase alcohol." Leary agreed with the statement of facts, adding that although the license was given to him it was not made for him and it did not bear his name or picture. The State's Attorney for Garrett County, James Sherbin, then indicated a desire for further information, and the following colloquy occurred:

> **Prosecutor:** I think before we get out of here we ought to find out just exactly who, the specific name and address of the person who did make it for him.
>
> **Leary:** That person is out of town.

---

3. A subsequent investigation by the Maryland State Police disclosed that Kirk Turney had followed his father's instructions. The State police concluded that perhaps five to ten fictitious licenses had been distributed. Leary, who was 19 at the time of his trial, received one of these licenses and stated that he might have used it once for the purpose of purchasing beer.

4. Although Garrett is one of the largest of Maryland's twenty-three counties in terms of area, it is the least densely populated, having an estimated population of 27,300 persons in 1985.

**Prosecutor:** I know. He is deceased or you don't remember who he is. But I am just suggesting to the court that we find out exactly who the man's name and address is, or impose the maximum sentence.

There was no immediate response to the State's attorney's "suggestion," but after a few moments Judge Turney asked the prosecutor for the "range of sanctions" for the offense. The prosecutor did not know, so he and the judge began a search of the Transportation Article of the Code. They finally agreed that the maximum sentence was two months imprisonment and a $500 fine.

Judge Turney next asked whether there was any evidence that Leary had used the fictitious license in the course of driving a motor vehicle. The State's attorney responded that Leary had not, and that "he wasn't using it for any purposes whatsoever." The prosecutor then returned to his earlier suggestion, and the following occurred:

**Prosecutor:** You don't have to make a public display of it, judge. But we ought to find out who this fellow is so that we can—I don't know whether this is a wholesale thing. I don't know what the deal is. It's a pretty good job, though. That's what bothers me.

**Leary:** (Unintelligible) it's minus a seal. And the mat on the front of it is very shabby and faded. And I personally know that when the trooper here looked at it, he obviously knew it was fictitious automatically. So I don't see it—I mean, personally, I honestly don't ever remember using it. I might have. I might not have. (Unintelligible) Maryland driver's license, comparing the two of them side-by-side, obvious that this license is fictitious.

**Judge:** All right, I would assume that the purpose for the license was to buy alcoholic beverages.

**Leary:** Correct.

**Judge:** It wasn't being used to operate a motor vehicle.

**Leary:** No, sir.

**Judge:** All right, the plea is warranted. There is a finding of guilty....

The prosecutor then argued for a "severe" penalty, pointing out that the use of a fictitious license to buy alcohol was a problem for businessmen who sold alcoholic beverages, and that there was strong public sentiment against selling alcohol to underage persons. Judge Turney recounted the circumstances under which the license had been found, the absence of any evidence indicating actual misuse or display, and the candor of Leary, and imposed a fine of $50 and costs. The State's attorney later testified that this disposition was "completely proper" and appropriate for this type of case.

Immediately after the hearing, the prosecutor confronted Leary in the hall outside the courtroom, where Leary and Christianson were talking, and asked him where he had gotten the license. Leary said Kirk Turney had given it to him, and Christianson verified that Leary had told him the same thing when first confronted about the license. According to the prosecutor, he returned to the courtroom, requested a recess, and spoke to Judge Turney in chambers. He told the judge that Leary was "saying that your son is the author, provider, or counterfeiter of this license, or gave him the license, something to that effect," and the judge replied "yeah, I know."

At this point, Judge Turney believed, as he had during the trial, that the State's attorney had known from the outset that Leary was identifying Kirk Turney as the source of the license. In talking with the prosecutor in chambers, however, the judge became convinced that the prosecutor's first knowledge of this fact was gained after the trial. Judge Turney explained how he had learned of his son's alleged involvement, and told the prosecutor of his observations at his son's dormitory room the preceding year.

The Commission on Judicial Disabilities found as fact the following:

> The Commission finds by clear and convincing evidence that Judge Turney knew that his son Kirk had been involved in manufacturing fictitious Maryland automobile

licenses; that he knew the defendant Leary and that Leary had spent time in the judge's home; that he knew that Leary was a friend of the judge's son Kirk; that he knew that Leary was the stepson of the judge's former wife; that he knew prior to trial that Leary had told the park ranger that Leary had obtained the fictitious license from the judge's son; and that the judge prevented the defendant from answering questions as to where he got the license and that the judge did so for the purpose of protecting his son.

We have reviewed the entire record and find the evidence sufficient to support these findings, which we accept.

The Commission further found that Judge Turney had violated Canons IV, XV and XXXIII of the Canons of Judicial Ethics and Rules 2 and 15 of the Rules of Judicial Ethics.[5] Upon our independent review and evaluation of the record, we conclude that Judge Turney violated Canon IV. That Canon provided:

A judge's official conduct should be free from impropriety and the appearance of impropriety; he should avoid infractions of law; and his personal behavior, not only upon the Bench and in the performance of judicial duties, but also in his everyday life, should be beyond reproach.

Under the particular circumstances of this case, Judge Turney should have recused himself from Leary's case, even though Leary intended to plead guilty. The judge knew his son was probably involved in the manufacturing of the fictitious license, and that his son's culpability might well be greater than Leary's. Fashioning a fair sentence for Leary had the potential for being almost as difficult as sentencing his own son, and in any event, the public percep-

---

5. By Rules Order entered November 21, 1986, Maryland Rule 1231 was amended. The Canons and Rules of Judicial Ethics were replaced by a Code of Judicial Conduct, effective July 1, 1987. The Rules Order provided, however, that judges would continue to be subject to discipline for violations of the former canons and rules that occurred before July 1, 1987.

tion would be that a judge would be disposed toward leniency in fixing a sentence that might later be used for comparison if the judge's son were charged and convicted of the same or a related offense.[6]

■ This is not a case of mandatory disqualification under the provisions of § 7 of Article IV of the Constitution of Maryland, which commands that:

No Judge shall sit in any case wherein he may be interested, or where either of the parties may be connected with him, by affinity or consanguinity, within such degrees as now are, or may hereafter be prescribed by Law, or where he shall have been of counsel in the case.

The "interest" of which this constitutional provision speaks is a pecuniary interest in the litigation or in the outcome of the litigation. *Edwardsen v. State*, 243 Md. 131, 137, 220 A.2d 547 (1966); *Ex parte Bowles*, 164 Md. 318, 326, 165 A. 169 (1933). Nor is this a case of automatic disqualification under former Rule 2 of the Rules of Judicial Ethics. Rule 2 provided:

A judge shall not exercise his duties with respect to any matter in which a near relative by blood or marriage is a party, has an interest, or appears as a lawyer. He shall not participate in any matter in which he has a significant financial interest or in which he previously acted as lawyer. For the purpose of this rule "near relative" shall mean connection by consanguinity or affinity within the third degree, counting down from a common ancestor to the more remote.

Leary was not related to Judge Turney by blood or marriage. He was a stepson of the judge's former wife. Judge Turney's son may have had an "interest" in the outcome of Leary's case, but it was not the type of direct or substantial

---

**6.** Section 14–110 of the Transportation Article prohibits the fraudulent counterfeiting of any official documents issued by the Motor Vehicle Administration as well as the possession of paraphernalia for use in such falsification. A violation of that section is punishable by up to two months imprisonment and a $500 fine.

interest contemplated by the automatic and mandatory language of Rule 2.

■ The obligation of a judge with respect to recusal does not end with the mandatory provisions of a constitution, statute or rule. The judge must also consider whether it would otherwise be improper to preside in the case, or if not improper, whether participation would give the appearance of impropriety. Additionally, where there is any possibility of bias or prejudice, the judge must make the subjective judgment of whether he or she can fairly and impartially preside in the case.

Determining whether recusal is required to avoid the appearance of impropriety may often be a difficult task. A high level of confidence in one's ability to be fair and impartial may actually interfere with the proper assessment of the problem of appearance of impropriety. Moreover, a judge's duty to sit where not disqualified is equally as strong as the duty not to sit where disqualified.

In resolving these sometimes difficult questions, it is well to keep in mind the observation made by Judge Smith in his dissenting opinion in *In re Diener and Broccolino*, 268 Md. 659, 698, 304 A.2d 587 (1973), *cert. denied*, 415 U.S. 989, 94 S.Ct. 1586, 39 L.Ed.2d 885 (1974):

> Courts, be they high or low, should and must be like Caesar's wife, above suspicion. Any other standard is one which undermines the trust and confidence of the average citizen in his government.

Federal judges are guided by 28 U.S.C. § 455(a), which requires disqualification "in any proceeding in which [the judge's] impartiality might reasonably be questioned." The test generally used in the application of this standard is an objective one—whether a reasonable member of the public knowing all the circumstances would be led to the conclusion that the judge's impartiality might reasonably be questioned. *See, e.g., United States v. Greenough*, 782 F.2d 1556, 1558 (11th Cir.1986); *Union Carbide Corp. v. U.S. Cutting Service, Inc.*, 782 F.2d 710, 715 (7th Cir.1986);

*United States v. DeLuna,* 763 F.2d 897, 907 (8th Cir.), *cert. denied,* 474 U.S. 980, 106 S.Ct. 382, 88 L.Ed.2d 336 (1985); *Smith v. Pepsico, Inc.,* 434 F.Supp. 524, 525–26 (S.D.Fla. 1977).

Not every error in judgment in determining whether recusal is appropriate to avoid the appearance of impropriety should result in discipline of the judge. Rule 1 of the Rules of Judicial Ethics provided that "[a]n aggravated or persistent failure to comply with the Canons of Judicial Ethics shall be deemed a rule violation," and Rule 15 provided that violation of a rule would be treated as conduct prejudicial to the proper administration of justice for purposes of judicial discipline.[7] Clearly, there is no evidence of persistent violations by Judge Turney. The question then, is whether Judge Turney's conduct under all the circumstances of this case was sufficiently serious to warrant a finding that it was prejudicial to the proper administration of justice. We conclude that it was, and in so concluding we do not look solely to his failure to disqualify himself from the handling of Leary's case, but look as well to his subsequent conduct in intentionally turning aside the inquiries of the State's attorney with respect to the identity of the person who manufactured or furnished the fictitious license.

At the hearing before the Commission on Judicial Disabilities, Judge Turney was questioned about his motive in ignoring or diverting the suggestion of the prosecutor that Leary be pressed for additional information. Denying that he actually interceded to prevent disclosure, Judge Turney admitted that he was attempting to avoid the embarrassment of having his son named in open court as the supplier of the license. Questions by two of the panel members, and Judge Turney's answers thereto, illustrate his position:

---

7. Compare present Canon 6B of the Maryland Code of Judicial Conduct, providing that a violation of the provisions of the Code "may be regarded as conduct prejudicial to the proper administration of justice" for disciplinary purposes.

**Panel Member:** You didn't want him to put your son's name in the record?

**Judge Turney:** That's right. I didn't want the embarrassment, or I didn't want him to embarrass me, and I felt sure that's what he was doing.

*     *     *     *     *     *

**Panel Member:** But you also weren't going to have him answer that question as to who supplied it if you could possibly avoid it, were you? Is that a fair statement? You didn't want your son's name in that record?

**Judge Turney:** That's oversimplified, yes.

We are persuaded that at the point in Leary's proceedings when this occurred, Judge Turney believed that the State's attorney already knew that Leary had identified the judge's son as the supplier of the license, and believed that the State's attorney was simply trying to embarrass him by making the allegation public.[8] That the judge incorrectly perceived the intent of the prosecutor does not excuse his conduct, but it is important to note that Judge Turney was not acting with the intent of shielding his son from criminal investigation or prosecution. He knew that the police, through Ranger Christianson, knew of his son's alleged involvement, and he assumed, albeit erroneously, that Christianson had told the prosecutor. We also note that there may have existed legitimate reasons for truncating the prosecutor's inquiry. Leary was unrepresented, and the prosecutor was attempting to gain information by having Judge Turney threaten Leary with two months imprisonment and a $500 fine if he did not disclose the source of the license. Given the nature of the offense and the admitted extent of Leary's involvement, a judge with no familial

---

**8.** Judge Turney testified that there had been previous occasions when he thought the State's attorney had attempted to embarrass him, or when there had been disagreement between them, but that generally they enjoyed a good professional relationship. Mr. Sherbin's high praise of Judge Turney's ability, demeanor, and fairness suggests that any significant differences that may have existed between them in the past have been resolved.

involvement and no acquaintanceship with the defendant may well have stepped in to question the appropriateness of the prosecutor's approach. Although a prosecutor under most circumstances may be free to deal with defendants in terms of plea concessions or penalty recommendations in return for information or assistance, the attempted involvement of the court in negotiations or threats is quite another matter. *See generally United States v. Bradford,* 645 F.2d 115 (2d Cir.1981) and *United States v. Miller,* 589 F.2d 1117, 1138–39 (1st Cir.1978). *See also United States v. Rogers,* 504 F.2d 1079, 1084–85 (5th Cir.1974); *United States v. Garcia,* 544 F.2d 681 (3d Cir.1976); and *Scott v. United States,* 419 F.2d 264 (D.C.Cir.1969); and *compare United States v. Vermeulen,* 436 F.2d 72, 76 (2d Cir.1970); *United States v. Chaidez-Castro,* 430 F.2d 766, 770 (7th Cir.1970); and *Gollaher v. United States,* 419 F.2d 520, 530 (9th Cir.1969). We need not dwell on these difficult issues because it is clear that Judge Turney acted not out of a desire to protect the defendant, but out of a desire to avoid embarrassment. Moreover, even if the prosecutor was improperly attempting to involve the court in a coercive sentencing process, and even if there existed a legitimate reason to interfere and redirect the proceedings, any attempt by Judge Turney to do so may have given the appearance of shielding his son from exposure. Although Judge Turney may not have been able to foresee all the various situations that might arise in Leary's proceeding, he should have appreciated that the actual circumstances of the case were too fraught with the appearance of impropriety to permit him to sit.

We turn to the contention that Judge Turney's conduct also violated Canons XV and XXXIII, and Rules 2 and 15. Canon XV provides:

A judge should conduct the work of his court with dignity and decorum and without interference which might detract from the proper courtroom atmosphere. He should so conduct himself during trial and hearings that his attitude, manner, or tone toward lawyers or

> witnesses will not prevent the proper presentation of the cause or the ascertainment of the truth. He may properly intervene whenever he considers it necessary to clarify a point or expedite the proceedings. He should not make an unnecessary display of learning or express a premature judgment. A judge should be most careful not to embarrass or add to the embarrassment or timidity of witnesses or lawyers.

This canon deals with the demeanor of a judge, and particularly with matters of attitude, manner, and tone. As previously indicated, we conclude that Judge Turney's handling of the prosecutor's attempts to secure information is properly considered in connection with the violation of Canon IV, and we decline to find an additional violation of Canon XV. Canon XXXIII constitutes a summary of judicial obligations, and thus a specific violation of Canon IV may fall within its broad language. We decline to find a separate violation of the general canon, preferring to address the specific conduct that is at issue in a way that will avoid conveying the erroneous impression that multiple acts of violation were involved. Concerning the alleged violations of the rules, we repeat our earlier determination that Rule 2 was not violated. Rule 15 is not, in fact, a rule of conduct. It is a statement that a violation of the rules constitutes conduct prejudicial to the proper administration of justice, and as such it is not a rule capable of being violated.

There remains for consideration the question of the appropriate sanction to be imposed for the violation of Canon IV, which, under the circumstances of this case, we have found to constitute conduct prejudicial to the proper administration of justice. The objectives of these proceedings, and of any sanction we may impose, are the maintenance of the honor and dignity of the judiciary and the proper administration of justice rather than the punishment of the individual. *In re Diener and Broccolino, supra,* 268 Md. at 670, 304 A.2d 587. The Commission has recommended that Judge Turney be censured, and upon our independent

evaluation of the record we agree that censure is appropriate.

FOR THE REASONS SET FORTH, JUDGE JACK R. TURNEY IS HEREBY CENSURED.