*Baltimore Police Department v. Antonin*, No. 443, September Term, 2017

**LAW ENFORCEMENT OFFICERS BILL OF RIGHTS - - DUE PROCESS - - RIGHT TO HEARING BOARD BEFORE OFFICERS OF ANOTHER DEPARTMENT - - *ACCARDI* DOCTRINE - - PREJUDICE REQUIRED.**

Vehicle being chased by police in Baltimore City veered off the road and crashed. Multiple Baltimore Police Department ("BPD") officers surrounded the vehicle and two removed the sole occupant from the vehicle and placed him on the ground. Thereafter, Officer Antonin, who had been driving a transport vehicle and was not in the group of officers surrounding the stolen car, walked quickly through the group to the arrestee, slapped him on the head, walked away, and then returned and slapped him on the head several more times. The police chase and events immediately following were videotaped by WBAL-TV and portions, including the slapping incident, were aired that evening. A BPD Deputy Commissioner commented about the incident that night, stating, "We did not like what we saw" and that a personnel action was being commenced immediately. A Use of Force Report was not prepared, as required by a BPD procedural rule, but the Internal Affairs Division ("IAD") of the BPD was notified early the next morning and began its investigation. Within slightly more than three months after the incident, the IAD had interviewed all the officers involved in the arrest, including two who had witnessed Antonin slap the arrestee. Antonin was charged criminally, at which time the Deputy Commissioner commented that the BPD "will not tolerate the actions of any officer that breaks the law in order to enforce the law." Eventually Antonin entered an *Alford* plea to one charge and the others were dismissed. The IAD interviewed him after the criminal charges were resolved.

Administrative charges were brought against Antonin. Shortly before his hearing board was scheduled to begin, he filed a written request that the hearing board be composed of officers from another jurisdiction, asserting that BDP officers would not be fair and impartial. The request was denied. During the hearing, he argued that the BPD violated the *Accardi* doctrine by not following its own rule, to his detriment, and that he was entitled to findings in his favor on that basis. The hearing board rejected that argument as well and found against Antonin. It recommended termination. The Police Commissioner adopted that recommendation and terminated Antonin.

Antonin brought an action for judicial review, in which he argued, among other things, that the hearing board had erred by denying his request for a hearing board composed of non-BPD officers and that the BPD had violated the *Accardi* doctrine. The circuit court ruled in Antonin's favor on both those issues. The BPD noted this appeal.

*Held*: Circuit court judgment reversed and termination by BPD reinstated. This case stands in contrast to *Sewell v. Norris*, 148 Md. App. 122 (2002), in which we held that a BPD officer could not be fairly tried by a hearing board composed of BPD officers

because, as widely covered in the press, the Mayor of Baltimore City and the Police Commissioner had publicly criticized his alleged misconduct in ways that made clear to BPD officers that they did not want him on the police force and would not tolerate findings in his favor. Here, the public comments by the Deputy Commissioner were not widely covered, were benign, and did not suggest that there could be retaliation by the police command if the hearing board found in Antonin's favor. In addition, there had been a complete turnover in the police command by the time of the hearing board.

Among other elements, Maryland's version of the *Accardi* doctrine requires proof that the agency's failure to follow its own rule resulted in prejudice. Here, Antonin made no showing that he suffered prejudice as a consequence of the BPD's failure to follow its procedural rule on use of force.

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 443

September Term, 2017

_____

BALTIMORE POLICE DEPARTMENT

v.

SERGE ANTONIN

_____

Woodward, C.J.,
Eyler, Deborah S.,
Reed,
        JJ.

_____

Opinion by Eyler, Deborah S., J.
_____

Filed: June 1, 2018

A hearing board for the Baltimore Police Department ("BPD") found Officer Serge Antonin guilty of general misconduct and use of excessive force. The BPD Police Commissioner terminated Antonin's employment.

On judicial review, the Circuit Court for Baltimore City reversed the final agency decision and ordered that Antonin be reinstated. It found that the BPD had erred by denying Antonin's request to be tried before a hearing board composed of non-BPD officers. It also found that the BPD did not adhere to its own administrative policy regarding use of force, in violation of the *Accardi* doctrine,[1] and that Antonin suffered prejudice as a result.

The BPD noted a timely appeal and presents two questions for review, which we have rephrased:

> I. Did the BPD improperly deny Antonin's request for a hearing board composed of non-BPD officers?
>
> II. Did the BPD violate the *Accardi* doctrine, causing prejudice to Antonin?

We answer each question in the negative. Accordingly, we shall reverse the judgment of the circuit court and reinstate the final agency decision terminating Antonin from employment.

### FACTS AND PROCEEDINGS

At about 6:10 p.m. on July 29, 2013, BPD officers in marked vehicles responded to reports of a stolen car being driven south on Belair Road in northeast Baltimore City.

---

[1] *See United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954).

The driver of the car later was identified as fourteen-year-old David Wilson. When Wilson saw that he was being chased by the police, he sped up, veered off the road, and crashed into two parked cars in a corner lot. A news helicopter for WBAL-TV videotaped the police chase and its aftermath.

Multiple police units arrived at the scene of the crash and officers surrounded the stolen car. The front end of the car was damaged, and Wilson had moved to the passenger's seat. Officers Theodore Galfi and Gersham Cupid approached the passenger-side door and pulled Wilson out of the vehicle.[2] They placed him on the ground in a prone position and began to handcuff him. Wilson resisted initially, but neither officer felt threatened and both thought that Wilson was effectively detained after being put on the ground.

Antonin was toward the end of the line of police vehicles in the chase, driving a prisoner transport wagon from the Northeast District. He arrived on the scene as Officers Galfi and Cupid were detaining Wilson. By then he knew the chase had ended in the Eastern District, so the suspect would be transported by a wagon from that district and not by him.

When Antonin arrived, about six officers were clustered around Officers Galfi and Cupid, who were standing over Wilson. Antonin got out of his wagon, quickly made his way through the group of officers to approach Wilson, and hit Wilson on the head with an open hand. Wilson was not handcuffed at that point. Antonin stepped away from

---

[2] Officer Cupid attained the rank of Sergeant before this case proceeded to a hearing board. For consistency, we shall refer to him as Officer Cupid.

Wilson after he was handcuffed. Seconds later, Antonin approached Wilson a second time, grabbed him, and hit him several more times on the head with an open hand.

That evening, WBAL-TV aired footage of the chase and Wilson's arrest, which showed Antonin hitting Wilson on the head. Shortly after WBAL-TV released the footage, then-Deputy Commissioner Jeronimo Rodriguez gave the following statement to the news station:

> We did not like what we saw. We are not waiting for anyone to initiate a personnel complaint. At the Commissioner's request we have initiated a personnel complaint and we are looking at this incident thoroughly from the beginning, during this incident, and immediately after.

At around 11:30 p.m., Sergeant Christopher Warren, acting under the order of then-Colonel Darryl DeSousa, Chief of Patrol, suspended Antonin from duty with pay pending further investigation into the incident.

At 1:30 a.m. on July 30, 2013, Sergeant Warren briefed a detective with the BPD Internal Affairs Division ("IAD") about the incident. IAD began its investigation that day into Antonin's use of force to determine whether he had 1) engaged in general misconduct in violation of General Order C-2 Rule 1[3] and 2) used excessive force in

---

[3] General Order C-2 Rule 1 provides:

Any breach of the peace, neglect of duty, misconduct or any conduct on the part of any member of the Department, either within or outside the City of Baltimore, which tends to undermine the good order, efficiency or discipline of the Department, or which reflects discredit upon the Department or any member thereof, or which is prejudicial to the efficiency and discipline of the Department, even though these offenses may not be specifically enumerated or laid down, shall be considered conduct

(Continued…)

-3-

violation of General Order C-2 Rule 1, Section 6.[4]  Between July 30 and November 5, 2013, IAD detectives interviewed fourteen officers who were on the scene when Wilson was arrested.  Of the fourteen, only Officers Galfi and Cupid actually saw Antonin hit Wilson.  Both stated that Antonin hit Wilson after Wilson had been handcuffed.  IAD detectives also obtained the WBAL-TV footage of the incident.  Because Antonin faced the possibility of criminal charges, IAD detectives delayed interviewing him.

On July 28, 2014, Antonin was charged with second-degree assault and two counts of misconduct in office, based on the incident involving Wilson.  In an article about the charges, the *Baltimore Sun* quoted Deputy Commissioner Rodriguez as saying, "We will not tolerate the actions of any officer that breaks the law in order to enforce the law."  In April 2015, while Antonin's criminal case was pending, Deputy Commissioner Rodriguez retired.

On October 5, 2015, Antonin entered an *Alford* plea to one charge of misconduct in office, and the State dismissed the remaining two charges against him.  He was given

---

(…continued)

      unbecoming a member of the B[PD], and subject to disciplinary action by the Police Commissioner.

[4] General Order C-2 Rule 1, Section 6 provides:

      Every member of the Department is prohibited from using unnecessary force or violence and shall not strike a prisoner or any other person, except in self-defense.  However, members must be firm and resolute, and if they are resisted, they may repel force with force, using only such force as is necessary to take a prisoner into custody.

probation before judgment, with one year of unsupervised probation. He completed all terms of his probation satisfactorily.

Following the disposition of Antonin's criminal case, the IAD resumed its investigation. On March 10, 2016, IAD Detective Jeffrey Thomas interviewed Antonin. Antonin acknowledged hitting Wilson twice. He said he hit him the first time to make him submit to being handcuffed. He said he hit him the second time because he had to "take him to my wagon" and he overheard Officer Cupid say something to the effect of "don't spit" or "stop spitting." Later in the same interview, he explained that he hit Wilson the second time because "I thought he was going to spit on me[.]"[5] Antonin admitted to being upset about Wilson's reckless driving and to yelling at Wilson, "you could have killed somebody . . . ."

On March 26, 2016, the IAD issued to the BPD Charging Committee its written report of investigation and finding on the allegations against Antonin. The report summarized the witness interviews and the evidence the IAD had reviewed, including the WBAL-TV videotape of the incident, and found:

> In his recorded statement, Officer Antonin admitted to striking Mr. Wilson twice with an open hand, during the events that occurred on July 29, 2013. Officer Antonin claimed that the first slap was meant to neutralize the on-going threat of Mr. Wilson's evasion of arrest and escape, and the second slap was the [sic] deter any attempt by Mr. Wilson to spit on Officer Antonin. Officer Antonin insisted that his actions were taken all in reasonable attempts to control Mr. Wilson. In spite of his claims, video footage of this incident shows that Officer Antonin was clearly not in control of his actions, considering the manner in which he hurriedly runs

_____

[5] Neither Officer Cupid nor Officer Galfi made any mention in their IAD interviews of Wilson spitting or threatening to spit.

toward Mr. Wilson, slaps him twice in rapid succession, and then briskly walks away in the footage. This behavior is more so characteristic of an emotional frenzy as opposed to a controlled response to a rebellious combatant. Furthermore, witness statements as well as Officer Antonin's own admission relayed that he was upset during this incident, further discrediting the notion that he was in full control of his actions during this incident.

Additionally, regardless of whether or not Mr. Wilson was handcuffed at the time of Officer Antonin's arrival, there was sufficient police presence at the time to adequately control his movements and any use of force would have been excessive. This is evidenced by the fact that Sergeant Christopher Warren, upon observing Sergeant Jason Bennett displaying his taser, quickly admonished Officer Bennett, knowing that this situation was controlled enough that the use of a taser would have been inappropriate. For the same reason that Officer Bennett's use of a taser would have been unwarranted, any use of force performed by Officer Antonin, likewise, was unwarranted, especially considering the fact that Officer Antonin used force after Officer Bennett had holstered his taser.

The IAD found "that the allegations of **Misconduct/General** and **Excessive Force** pertaining to Officer Serge Antonin are rendered **<u>Sustained</u>**."

Antonin was charged administratively and chose to proceed before a hearing board. Pursuant to the Law Enforcement Officers' Bill of Rights ("LEOBR"), Md. Code (2003, 2011 Repl. Vol.), sections 3-101 to 3-113 of the Public Safety Article ("PS"), hearing boards in law enforcement officer disciplinary matters are to consist of at least three members who "are appointed by the chief and chosen from law enforcement officers within th[e] law enforcement agency [that initiated the investigation], or from law enforcement officers of another law enforcement agency with the approval of the chief of the other agency[.]" PS § 3-107(c)(1)(i). One week before Antonin's hearing board was to begin, his lawyer requested in writing that the hearing board be composed of non-BPD officers. He argued that Deputy Commissioner Rodriguez's statements after

the WBAL-TV footage aired and after Antonin was charged criminally showed that it was "highly improbable that officers selected by the [BPD] to sit in judgment of the officer [Antonin] are neutral and unbiased and not influenced by the administration." The request was denied by BPD Police Commissioner Kevin Davis..

Antonin's hearing began on October 26, 2016, and lasted two days. The members of the hearing board were BPD Major Robert Jackson, BPD Major George Clinedinst, and BPD Officer Bobbie Gilliam. As a preliminary matter, counsel for Antonin argued that the hearing board did not have jurisdiction over his case because the BPD had not followed its own procedure for investigating his use of force. He explained that "nobody did a use of force investigation or report [pursuant to BPD General Order K-15] as required under *Accardi* . . . . In other words, S[ergeant] Warren was supposed to do certain things, reports were supposed to be generated immediately. It wasn't done." Counsel for the BPD responded that the BPD may "independently investigate any actions of its members" and that its "independent investigation can go forward without a formal use of force or excessive force charge being filed by the Department and/or its members." The hearing board rejected Antonin's argument, and the hearing proceeded.[6]

The Board watched the WBAL-TV footage of the incident and heard testimony from seven witnesses, including Antonin, Detective Thomas, and Officers Galfi and

___

[6] Antonin unsuccessfully renewed his motion to have the hearing board members replaced with non-BPD officers.

Cupid.[7]  It took Antonin's *Alford* plea into consideration.  The Board found Antonin guilty of general misconduct and use of excessive force, explaining that "Antonin unnecessarily used force and struck . . . Wilson several times with an open hand after he was effectively detained by other police officers."  It recommended termination.  On November 8, 2016, Commissioner Davis adopted the recommendation and terminated Antonin.

In the Circuit Court for Baltimore City, Antonin filed a timely action for judicial review.  He argued, among other points, that the BPD violated his due process rights by denying his request to have his case heard by non-BPD officers and by failing to adhere to its own administrative procedure on use of force, to his prejudice.  The court agreed with Antonin on those two grounds.  In deciding that Antonin was entitled to a hearing board composed of non-BPD members, the court opined, "based on the statements of Deputy Commissioner Rodriguez and the media attention surrounding [Antonin's] conduct, the . . . hearing board, composed of BPD officers, was not neutral."  It found that Deputy Commissioner Rodriguez's statement on the day of the incident "demonstrates that the BPD had already condemned [Antonin's] conduct, prior to any investigation or criminal charges."  It further found that Deputy Commissioner

---

[7] The hearing board also heard from Sergeant Freddie Bland, who first reported the stolen vehicle, and Officers Rebecca Small and Elsie McCray, who pursued Wilson during the chase.  (At the time of the incident and when she was interviewed by the IAD, Officer Small's last name was Ward.)  None of them saw the interaction between Antonin and Wilson in which Antonin hit Wilson.

Rodriguez's two statements together "demonstrate the position of the BPD: [Antonin] was guilty of excessive force before a conviction or a hearing."

The court also found that "the BPD did not comply with its internal policies," specifically, that one of Antonin's supervisors should have issued a use of force report about the incident, pursuant to General Order K-15, and that Antonin was prejudiced by the absence of a use of force report.

> Although a report by the first rank supervisor may have indicated that [Antonin] did violate the Use of Force policy, it could also have indicated that he did not. Such a report could have significantly altered the findings of the . . . board.
>
> . . . A report from a supervisor who had investigated this almost immediately after the incident would have been invaluable for both sides as evidence to present at the hearing.
>
> [T]he majority of witnesses were not interviewed until some 90 days after the conduct occurred. Had BPD complied, these witnesses to the incident would have been interviewed shortly after the [Antonin]'s conduct occurred. Of the fourteen officers interviewed by IAD, ten were interviewed between October 28, 2013 and November 5, 2013. These interviews occurred after statements by [Deputy] Commissioner Rodriguez had been made, the footage had aired on WBAL, and the interviews were conducted by IAD, not the first rank supervisor. . . . In addition, [Antonin] was not interviewed until almost two and a half years after the incident. Although BPD argued that IAD wanted to wait to interview [Antonin] until after the criminal case concluded, [Antonin] entered the *Alford* plea on October 5, 2014, yet IAD did not interview [Antonin] until a year and a half later on March 10, 2016.[8]

---

[8] Officer Antonin entered his *Alford* plea on October 5, 2015, not 2014. Accordingly, IAD interviewed Officer Antonin five months after his *Alford* plea.

The court ruled that the final agency action could not stand under *Accardi*.[9]

The BPD noted this timely appeal.

## STANDARD OF REVIEW

The standard of review in a LEOBR case "'is that generally applicable to administrative appeals.'" *Coleman v. Anne Arundel Cty. Police Dep't.*, 369 Md. 108, 121 (2002) (quoting *Montgomery Cty. v. Stevens*, 337 Md. 471, 482 (1995)). We are tasked with determining whether the administrative agency, as opposed to the circuit court, erred. *Baltimore Police Dep't. v. Ellsworth*, 211 Md. App. 198, 207 (2013) (citing *Bayly Crossing, LLC v. Consumer Prot. Div., Office of Atty. Gen.*, 417 Md. 128, 136 (2010)). Accordingly, "'we bypass the judgment of the circuit court and look directly at the administrative decision.'" *Id.* (quoting *Salisbury Univ. v. Joseph M. Zimmer, Inc.* 199 Md. App. 163, 166 (2011)).

"'In reviewing an administrative agency decision, we are limited to determining if there is substantial evidence in the record as a whole to support the agency's finding and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law." *Id.* (quoting *Mehrling v. Nationwide Ins. Co.*, 371 Md. 40, 57 (2002)). While we review an administrative agency's conclusion of law *de novo*, *Coleman*, 369 Md. at 122, "an administrative agency's interpretation and application of the statute which the agency administers should ordinarily be given considerable weight

---

[9] In its order, the court stated that if the BPD "decides to retry this matter, it must use a hearing board comprised of officers of a different law enforcement agency[.]" It did not explain, however, how the *Accardi* doctrine violation could be cured by a new hearing board.

-10-

by reviewing courts. *Bd. of Physician Quality Assur. v. Banks*, 354 Md. 59, 69 (1999) (citing *Lussier v. Maryland Racing Comm'n*, 343 Md. 681, 696–97 (1996)).

## DISCUSSION

## I.

Antonin contends the BPD violated his procedural due process rights because the hearing board was composed of BPD members, and BPD members could not be impartial. He argues that the

> two separate statements [that] were made by Deputy Commissioner Rodriguez . . . demonstrated that it was the [BPD]'s belief that A[ntonin] was guilty of excessive force before there was any hearing conducted nor any determination of A[ntonin]'s guilt as a matter of law. There was also significant media coverage generated after the release of the video.

He maintains that *Sewell v. Norris*, 148 Md. App. 122 (2002), supports his position (and the circuit court's ruling in his favor on this issue).

The BPD contends this case differs significantly from *Sewell* and the circuit court's ruling was in error. Specifically, the two statements by Deputy Commissioner Rodriquez were not such as would lead BPD hearing board members to believe that only one outcome—against Antonin—would be acceptable to the command leadership and, in any event, there had been a complete turnover in the command leadership by the time of the hearing board.

"[P]rocedural due process in an administrative proceeding 'requires that administrative agencies performing adjudicatory or quasi-judicial functions observe the basic principles of fairness as to parties appearing before them.'" *Coleman*, 369 Md. at 142 (quoting *Gigeous v. Eastern Corr. Inst.*, 363 Md. 481, 509 (2001)). As such, parties

appearing before an administrative hearing board are entitled to a board that consists of impartial members. *Sewell*, 148 Md. App. at 136 ("A necessary component of a fair trial is an impartial judge.") (citation omitted).

The Court of Appeals has explained, however, that

> [T]here is a strong presumption in Maryland . . . and elsewhere . . . that [decision makers in judicial and quasi-judicial proceedings] are impartial participants in the legal process, whose duty to preside when qualified is as strong as their duty to refrain from presiding when not qualified. . . . The recusal decision, therefore, is discretionary . . . and the exercise of that discretion will not be overturned except for abuse.

*Regan v. State Bd. Of Chiropractic Examiners*, 355 Md. 397, 410–11 (1999) (quoting *Jefferson-El v. State*, 330 Md. 99, 107 (1993)). In determining whether a decision-maker is impartial, we look for an appearance of impropriety rather than "'delving into the subjective mindset of the challenged'" decision maker. *Id.* at 411 (quoting *Surrat v. Prince George's Cty.*, 320 Md. 439, 468 (1990)). Thus, the test is objective: "'whether a reasonable member of the public knowing all the circumstances would be led to the conclusion that the [decisionmaker]'s impartiality might reasonably be questioned.'" *Id.* (quoting *In re Turney*, 311 Md. 246, 253 (1987)).

In *Sewell*, the BPD Internal Affairs Integrity Unit conducted a "random undercover sting operation" designed to expose "dirty" officers. 148 Md. App. at 126. From what was observed, BPD Officer Sewell was thought to have planted drugs on a suspect. He was indicted for perjury and misconduct in office. His "criminal charges received extensive publicity, including thirty-three newspaper articles that appeared in the *Baltimore Sun*" in a five-week period. *Id.* at 127.

A few months later, the Baltimore City State's Attorney's Office dismissed the criminal charges against Sewell. This produced heated negative reactions from then-BPD Commissioner Edward Norris and then-Mayor Martin O'Malley. The *Baltimore Sun* reprinted a statement by Commissioner Norris, made on the day of Sewell's arrest, that described Sewell's conduct as "a horrible breach of the public trust[.]" *Id.* at 128. It further quoted Commissioner Norris as saying:

> "We are extremely disappointed in the State's Attorney's decision not to move forward with [Sewell's] case, but defer to their judgment in doing so," [and that the decision to drop the criminal case] "will certainly not deter the efforts of the . . . Department in its commitment to root out corrupt police officers and to restore the integrity of the agency."

*Id.* The *Baltimore Sun* recounted Mayor O'Malley's unvarnished commentary as follows:

> "I think the failing in these cases to not go forward, and I'll be goddamned if we're going to stop doing integrity cases and doing stings just because we have a prosecutor who's afraid to go forward and try them," said [the Mayor], who has been critical of [the State's Attorney] in the past. "Maybe we'll find a prosecutor with a little bit of guts to go forward," he said. "I talked to her before she dropped this case . . . begged her, pleaded with her and tried to persuade her to go forward with this case. She said, 'No, too many red herrings.' I think the poor woman must have been attacked by red herrings when she was a child. She sees red herrings everywhere."
>
> [The Mayor] said he and the Police Department are considering finding a way to prosecute integrity cases without [the State's Attorney], if possible. *He also noted that Sewell has to appear before a departmental trial board.*
>
> *"He's not going to serve in my Police Department,"* [the Mayor] said.

*Id.* at 127 n. 5 (emphasis in *Sewell*).

Sewell was charged administratively. Before his hearing board took place, he filed a petition to show cause in the circuit court, asking the court to order the BPD to

select members for the hearing board from a law enforcement agency other than the BPD. The court denied that request on the ground that it did not have authority to grant it.

Sewell noted an appeal to this Court, challenging the denial of his request.[10] We reversed. Reasoning that procedural due process mandates fair tribunals, we held that the circuit court had authority to direct that the BPD select non-BPD members for Sewell's hearing board and, under the facts of the case, it erred by not doing so. As to the latter, we explained:

> [D]ue process . . . is not a rigid concept . . . . [It] is flexible and calls only for such procedural protections as the particular situation demands. . . . [I]n determining what process is due, the Court will balance the private and government interests affected. . . . In that regard, we apply the following balancing test developed by the Supreme Court in *Mathews* [*v. Eldridge*], 424 U.S. [319,] 335 . . . [(1976)], to assist us in our endeavor:
>> Identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 134–35 (quoting *Coleman*, 369 Md. at 143–44) (some quotations omitted). We observed that the LEOBR allows a hearing board to be composed of officers from another agency, with approval of the police chief of that agency, and that "[i]t is obvious that the deliberate selection of a hearing board that is biased against an officer would

---

[10] After the court denied Sewell's petition to show cause, the hearing board went forward. The hearing board found against him, and he was terminated by the Commissioner. He filed an action for judicial review which was stayed pending the outcome of the appeal from the circuit court's ruling.

constitute a violation of the procedural safeguards required by the due process clause." *Id.* at 135.

We considered the *Mathews* factors, and decided that they weighed in favor of requiring non-BPD officers on Sewell's hearing board. We concluded that because of the intense public comments against Sewell by the Commissioner and Mayor, BPD officers selected to serve on Sewell's hearing board would fear adverse employment action if they were to find in Sewell's favor. Therefore, Sewell's "right to due process was violated by the selection of a hearing board comprised of B[]PD officers." *Id.* Moreover, selecting non-BPD officers would "bolster public confidence in the board's decision," *id.*; the cost of having non-BPD officers hear Sewell's case was minimal; and the BPD did "not have a particularly strong interest in trying" Sewell. *Id.* at 136.

As noted, "'[d]ue process . . . is not a rigid concept . . . . [It] is flexible and calls only for such procedural protections as the particular situation demands.'" *Id.* at 134 (quoting *Coleman*, 369 Md. at 143). In the instant case, Deputy Commissioner Rodriguez's two statements to the press were measured. He made the first statement in response to the television broadcast of the videotape clearly showing a BPD police officer (later identified as Antonin) slapping a suspect who is on the ground. Deputy Commissioner Rodriguez said, "We do not like what we [saw]," obviously referring to the slapping, and explained the immediate investigative process the BPD planned to undertake. He did not say or imply that the officer was guilty of a crime, insist that the officer be terminated, question the officer's integrity, or suggest that it was imperative that the officer be disciplined. He gave an even-tempered reaction to footage of an

-15-

officer striking a detained suspect on the head. Deputy Commissioner Rodriguez's second statement, made in response to the filing of criminal charges against Antonin, communicated what should be obvious, that the BPD does not approve of officers breaking the law to enforce the law, *i.e.,* that officers are not immune from the law. This also was not a statement implying guilt.

The BPD media statements in this case were completely unlike those in *Sewell.* In the media statements in *Sewell*, the Commissioner and the Mayor condemned Sewell for engaging in misconduct and made clear that they did not want him in the BPD. Commissioner Norris accused him of "a horrible breach of the public trust" by "outrageous" conduct, *id.* at 127 n.4, and Mayor O'Malley, observing that Sewell would be going before a hearing board, announced flat-out that "[h]e's not going to serve in my Police Department.'" *Id.* at 138. All members of the BPD, and therefore any member who might be selected for Sewell's hearing board, would have known that their boss (the Commissioner) and their boss's boss (the Mayor) wanted Sewell out of the BPD and that, if a hearing board did not make findings that would enable Sewell's termination, there would be a price to pay.

In the case at bar, by contrast, Deputy Commissioner Rodriguez's statements could not reasonably be taken to mean that a disciplinary finding in favor of Antonin would be met with disapproval by the BPD command leadership. Both statements were benign, non-accusatory observations. Neither statement passed judgment on Antonin and neither statement implied that it would not behoove officers on a hearing board to find in favor of Antonin.

Moreover, Deputy Commissioner Rodriguez and much of the BPD command leadership had departed from the BPD before Antonin's hearing board was held. As the BPD points out, even if Deputy Commissioner Rodriguez's statements could be read to demand a negative hearing board outcome against Antonin (which they cannot), with that turnover, a hearing board composed of BPD members "had no incentive to render a particular decision to satisfy the expectations of a departed administration and had no cause to believe that their current leadership preferred one outcome over another."

As noted, Antonin asserts that his case generated "significant media coverage." In *Sewell*, we observed that there was extensive publicity about the criminal charges against the officer, including 33 articles in the *Baltimore Sun*, and the "intense publicity about the statements made by the Commissioner and by the Mayor who appointed him" likely would have influenced members of the hearing board. *Id.* at 135. There was no such risk here. As stated earlier, the comments made by Deputy Commissioner Rodriguez were benign. Furthermore, there is no indication in the record that this case garnered the widespread media attention seen in *Sewell*. The circumstances here did not create actual or apparent partiality from a hearing board composed of BPD members.

After weighing the risk of actual or apparent partiality due to Deputy Commissioner Rodriguez's statements against the countervailing strong presumption of impartiality, we hold that the BPD did not abuse its discretion by denying Antonin's request to have his case heard by non-BPD members.

**II.**

-17-

The BPD's procedural policy regarding "Use of Force" is set forth in written General Order K-15. The stated purpose of the policy is "to thoroughly investigate and document all uses of force by members of the agency." The policy directs that "[u]se of deadly and less than deadly force, including strikes with fists or hands, shall conform with the methods, tactics and guidelines adopted by the [BPD]" and "[a]ny use of force must be reasonable and no more than necessary to effect a lawful purpose." General Order K-15, lists examples of "REPORTABLE FORCE," including "[a]ny striking of a suspect and/or arrestee with hands or feet."

General Order K-15 details the actions that are required after a reportable use of force has occurred. The member, *i.e.*, the officer, must "[i]mmediately notify your supervisor" and "[s]ubmit a written Use of Force Report whenever you use reportable force."[11] The Use of Force Report "**must** be submitted **before** the end of your tour of duty."

The "First Line Permanent Rank Supervisor" is required to take action in two situations. First, "[w]hen notified of a reportable use of force by a member under your supervision[,]" the supervisor must respond to the scene, attend to any injured people, and initiate a Use of Force investigation, including speaking with witnesses and collecting evidence. This did not apply here because Antonin did not notify Sergeant Warren, the first line permanent rank supervisor, of a reportable use of force (or any use of force).

---

[11] The policy refers to a separate policy that is to be followed if the reported force involves the discharge of a weapon.

Second, and pertinent here, when a member has not reported a use of force, but an allegation of excessive force by a member has "arise[n]," the first line permanent rank supervisor must "[t]ake appropriate investigative measures." This includes "[r]equest[ing] that the involved member submit an administrative report with facts relevant to the Use of Force incident" and "[o]rdering all witnessing members to submit administrative reports of the incident" unless they invoke their right to remain silent. In addition, the first line permanent rank supervisor must complete a Use of Force Summary Report; provide it to the commanding officer; and ensure proper reporting. The policy does not provide deadlines. In addition, it states that the BPD may "pursue an administrative investigation" even if the person alleging excessive force fails to timely do so.

Upon review of the "Use of Force Summary Report," the commanding officer must "[d]etermine if the involved member's actions were consistent with departmental policies and procedures and whether the actions were within the legal scope of the member's authority." The commanding officer then must create a "Use of Force package," which includes the Use of Force Summary Report, the member's Use of Force Report, any witness reports, and any prior Use of Force Reports involving the member. The Use of Force package is forwarded to the Chief of the IAD, who initiates a more thorough investigation into the matter.

The circuit court found that General Order K-15 was not followed after the incident in this case. Specifically, Sergeant Warren did not prepare a Use of Force Summary Report or conduct a Use of Force investigation. As noted, the court concluded

that the BPD's failure to follow its own procedure invalidated the final agency decision under the *Accardi* doctrine.

The *Accardi* doctrine "requires, with some exceptions, an administrative agency to generally follow its own procedures or regulations." *Pollock v. Patuxent Inst. Bd. of Review*, 374 Md. 463, 467 n.1 (2003). Its genesis was *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954), in which the Supreme Court "vacated a deportation order of the Board of Immigration Appeals because the procedure leading to the order did not conform to the relevant regulations." *Montilla v. Immigration and Naturalization Service*, 926 F.2d 162, 167 (2d Cir. 1991). The *Accardi* doctrine is not uniform across jurisdictions, state or federal. For example, some courts require the aggrieved person to show that he has been prejudiced by the agency's departure from its procedure, whereas other courts reject the prejudice requirement. *See Leslie v. Atty. Gen. of the United States*, 611 F.3d 171, 177 (3d Cir. 2010) (providing examples).

In *Pollock*, Maryland adopted its own variation of the *Accardi* doctrine. The Court of Appeals examined how the doctrine was applied by courts inside and outside of Maryland, before settling on the following framework:

> [A]n agency of the government generally must observe rules, regulations or procedures which it has established and under certain circumstances when it fails to do so, its actions will be vacated and the matter remanded. This adoption is consistent with Maryland's body of administrative law, which generally holds that an agency should not violate its own rules and regulations.
>
> In so holding we nonetheless note that not every violation of internal procedural policy adopted by an agency will invoke the *Accardi* doctrine. Whether the *Accardi* doctrine applies in a given case is a question of law that . . . requires the courts to scrutinize the agency rule or regulation at

issue to determine if it implicates *Accardi* because it affects individual rights and obligations or whether it confers important procedural benefits or, conversely, whether *Accardi* is not implicated because the rule or regulation falls within the ambit of the exception which does not require strict agency compliance with internal procedural rules adopted for the orderly transaction of agency business, *i.e.*, not triggering the *Accardi* doctrine.

\* \* \*

Where the *Accardi* doctrine is applicable, we are in accord with the line of cases arising from the Supreme Court and other jurisdictions which have held that prejudice to the complainant is necessary before the courts vacate agency action. In the instances where an agency violates a rule or regulation subject to the *Accardi* doctrine, *i.e.*, even a rule or regulation that affects individual rights or obligations or affords important procedural benefits upon individuals, the complainant nevertheless must still show that prejudice to him or her (or it) resulted from the violation in order for the agency decision to be struck down.

*Id.* at 503–04 (quotations omitted).

Thus, a Maryland agency's decision will be vacated under the *Accardi* doctrine when three conditions are satisfied. First, the agency must have violated its own regulations or procedures. Second, those regulations or procedures must affect individual rights and obligations or confer important procedural benefits, and not have been adopted merely for the orderly transaction of agency business.[12] Finally, the party alleging a violation must show that the violation resulted in prejudice to him or her.

---

[12] A violation of a regulation or procedure adopted for the orderly transaction of agency business may be grounds to vacate a decision of an agency under the Maryland Administrative Procedure Act ("APA"), Md. Code (1984, 2014 Repl. Vol.), sections 10-101 to 10-305 of the State Government Article, if the party alleging a violation can "show prejudice to a substantial right due to the violation of the" internal administrative regulation or procedure. *Pollock*, 374 Md. at 504. That vacation would be pursuant to the APA, however—not *Accardi*.

-21-

In this case, Antonin asserts that the BPD failed to comply with General Order K-15 because, even though an allegation of use of excessive force had arisen, the first line permanent rank supervisor (Sergeant Warrant) did not undertake an investigation, including interviews of witnesses, and did not prepare a Use of Force Summary Report. Antonin acknowledges that he did not submit a Use of Force Report himself, as General Order K-15 required, but argues that that was unnecessary because Officer Cupid, who was an Officer-in-Charge, witnessed him strike Wilson, and Sergeant Warren was present, although he did not see Antonin strike Wilson. Antonin maintains that he was prejudiced because the witness interviews that would have been undertaken pursuant to General Order K-15 would have happened soon after the incident, not roughly three months later, when many of the IAD interviews took place, and therefore would have more accurately preserved the evidence. He asserts that the Use of Force Summary Report could have shown, based on promptly collected evidence, that he did not use excessive force. He also complains that he "was not interviewed until two and a half years after the incident."

The BPD asserts that it did not violate General Order K-15 because it was Antonin's responsibility to initiate the Use of Force process; that General Order K-15 does not trigger the *Accardi* doctrine because it is a procedure adopted merely for the orderly transaction of business; and that Antonin failed to show that he was prejudiced by any failure of the BPD to follow General Order K-15.

We need not decide whether the BPD failed to comply with General Order K-15 or whether that policy embodies a procedure that bestows an important procedural

-22-

benefit, triggering the *Accardi* doctrine. Even if we assume those issues in Antonin's favor, we conclude that the record evidence before the hearing board was legally insufficient to prove that Antonin suffered prejudice due to the BPD's failure to follow General Order K-15.

*Dep't of Pub. Safety and Corr. Servs. v. Howard*, 339 Md. 357 (1995), is helpful in assessing the evidence for proof of prejudice. There, two correctional officers assaulted an inmate. The Department of Corrections investigated the assault and completed that investigation less than a month later. Ten-and-a-half months after the investigator issued his findings, the Department filed charges for removal against the correctional officers. Eventually, they were terminated from employment. On judicial review, the circuit court reversed, ruling in part that the "investigation had grossly exceeded the 90-day period provided for in the regulations."[13] *Id.* at 365.

The Court of Appeals granted *certiorari* before the appeal was heard by this Court. The officers argued that the circuit court's reversal should be upheld because the delay in charging them was arbitrary and capricious and had prejudiced them. The Court disagreed and reversed. In holding that the Department did not act arbitrarily or capriciously by waiting ten-and-a-half months after the investigation ended before charging the correctional officers, the Court observed,

> [T]he record does not reflect any prejudice to the officers that was caused
> by the delay. . . . They have not pointed to any witnesses whose memory
> has faded or who has become unavailable. They argue, without citing

[13] The court mistakenly understood that filing charges was part of the investigation process.

specific examples, that they have been prejudiced because witnesses' memories have faded and evidence has become stale. Ten and a half months, however, is not an extraordinary length of time to preserve evidence.

*Id.* at 370.

In the case at bar, Antonin likewise has provided no concrete examples of how the lack of a Use of Force Summary Report and investigation prejudiced him. He merely posits that an investigation conducted by Sergeant Warren "could have" produced a different result. There is nothing to suggest that it would have, however.

Officers Cupid and Galfi were interviewed (separately) by IAD on November 1, 2013, 95 days after the incident. Neither one had trouble remembering the pertinent facts—that they had detained Wilson, that Antonin struck him multiple times, and that Antonin struck him after he was in handcuffs. Indeed, they gave detailed accounts of the chase and the events that transpired after Wilson crashed the stolen car. Their interviews were transcribed and were moved into evidence at the hearing board, before which they both testified. During Officer Cupid's testimony, the WBAL-TV videotape was played to assist him in determining whether Wilson already was handcuffed when Antonin slapped him. He testified that Wilson was not handcuffed when Antonin slapped him the first time but was handcuffed when Antonin slapped him the "second, third, and fourth times."

Officers Ward and McCray likewise recalled the chase and arrest in detail when they were interviewed by an IAD detective on October 29, 2013, and November 4, 2013, respectively. They, too, testified before the hearing board, explaining that they were the

first unit to arrive at the scene of the crash and that they positioned themselves on the driver's side of the stolen car. From that position, they could not see Antonin's interactions with Wilson.

From the investigation carried out by IAD and the testimony of witnesses at trial, there is no reason to believe that if witness interviews were conducted immediately after the incident, the witnesses' memories would have differed from what they were when they were interviewed by IAD detectives approximately three months after the incident. Like the *Howard* Court, we conclude that in this case three months was "not an extraordinary length of time to preserve evidence," including recollections by witnesses. 339 Md. at 370. Furthermore, Sergeant Warren, as the first line permanent rank supervisor, did not have a deadline for completing a Use of Force investigation. Had Antonin reported his use of force to Sergeant Warren immediately, Sergeant Warren could have interviewed witnesses at the scene and called a mobile crime laboratory technician to collect evidence and take photographs. Antonin did not do so, however, and Sergeant Warren first learned about the use of force hours later, after WBAL-TV ran its story. By then, Sergeant Warren could not immediately investigate, and General Order K-15 does not provide a timeframe for the completion of Use of Force investigations that are triggered by allegations of someone other than the officer. Thus, there is no reason to think that a Use of Force investigation under General Order K-15 would have been conducted more quickly than the IAD investigation.

In addition, the Board relied in part on the WBAL-TV footage to conclude that Antonin was guilty of using excessive force. As the BPD correctly notes, this footage

"was impervious to effects of bias, the passage of time, or any other nefarious influence Antonin may blame for his termination." The videotape clearly shows Antonin rapidly approach the group of officers surrounding Wilson, slap Wilson on the head, retreat, and return and slap Wilson several more times on the head. The only fact about which Officer Cupid's memory was not clear, and may have been clear had he been interviewed immediately, was whether Wilson was handcuffed the first time Antonin slapped him. By viewing the videotape, Officer Cupid was able to clarify that the handcuffs had not been applied when Antonin first slapped Wilson but were in place when Antonin returned and slapped him several more times. Moreover, that fact was not material, because (as the hearing board found) Wilson was effectively detained by the officers surrounding him before the handcuffs were applied.

Finally, Antonin's claim that he was prejudiced because he "would clearly have the most knowledge of the force used in this case, [and] was not interviewed until two and a half years after the incident" lacks merit. Antonin was facing the possibility of being criminally charged and, in fact, eventually was charged. As a matter of policy, IAD detectives did not interview Antonin in order to avoid putting him in the position of making a self-incriminating statement. Moreover, when Detective Thomas interviewed Antonin after the resolution of his criminal case, the only part of the incident that Antonin could not recall was whether Wilson had said anything to him. Other than that, Antonin was able to give a thorough account of the incident.

For all these reasons, Antonin was not prejudiced by the BPD's failure to carry out a Use of Force investigation pursuant to General Order K-15.

-26-

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY REVERSED. CASE TO BE REMANDED TO THAT COURT TO ENTER ORDER AFFIRMING THE FINAL AGENCY DECISION. COSTS TO BE PAID BY THE APPELLEE.**