663 A.2d 74

## DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONAL SERVICES et al.

v.

## Walter G. HOWARD.

## DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONAL SERVICES et al.

v.

## Brandon D. TAYLOR.

No. 15, Sept. Term, 1995.

Court of Appeals of Maryland.

Aug. 21, 1995.

Andrew H. Baida, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen.; Alan D. Eason, Asst. Atty. Gen., all on brief), for appellants.

Christyne L. Neff (Joel A. Smith and Sarah P. Harlan, Kahn, Smith & Collins, P.A., all on brief), Baltimore, for appellees.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ.

MURPHY, Chief Judge.

In this case, we must determine whether an agency's removal of two correctional officers from state service was an arbitrary and capricious action.

## I.

The General Assembly has prescribed that a classified service employee who has completed probation may be removed "only for cause." Maryland Code (1993, 1994 Repl. Vol.), § 9–202 of the State Personnel and Pensions Article. The General Assembly has delegated to the Secretary of Personnel the responsibility to "adopt regulations that prescribe what may constitute cause for removal." *Id.* § 9–203.

When an agency seeks to remove an employee it must file charges for removal with the Secretary of Personnel. Code of Maryland Regulations (COMAR) 06.01.01.48.A. An employee may "appeal" charges for removal to the Office of Administrative Hearings and receive a hearing before an administrative law judge (ALJ). COMAR 06.01.01.57, 06.01.01.61. The ALJ issues a "written proposal for decision," which is subject to

approval by the Secretary of Personnel. *Id.* The employee may file exceptions to the proposal with the Secretary and present oral argument on them. *Id.* The Secretary (or a designee of the Secretary) then issues a final decision. *Id.*

The final decision of the Secretary is subject to judicial review in a circuit court pursuant to Maryland Code (1984, 1993 Repl.Vol., 1994 Cum.Supp.), § 10–222 of the State Government Article, a section of the Administrative Procedure Act. When exercising such review, a circuit court may:

"(1) remand the case for further proceedings;

(2) affirm the final decision; or

(3) reverse or modify the decision if any substantial right of the petitioner may have been prejudiced because a finding, conclusion, or decision:

(i) is unconstitutional;

(ii) exceeds the statutory authority or jurisdiction of the final decision maker;

(iii) results from an unlawful procedure;

(iv) is affected by any other error of law;

(v) is unsupported by competent, material, and substantial evidence in light of the entire record as submitted; or

(vi) is arbitrary or capricious."

§ 10–222(h). "A court's role is limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law." *United Parcel v. People's Counsel,* 336 Md. 569, 577, 650 A.2d 226 (1994).

## II.

On July 20, 1991, Walter G. Howard and Brandon D. Taylor, correctional officers serving at Eastern Correctional Institution, were assigned to the visiting room. Taylor saw an inmate receive some chewing gum, which is contraband, from a visitor. Taylor called the inmate aside and ordered him to dispose of the gum. The inmate threw the gum, using an

overhand motion, into the waste basket. Taylor again called the inmate aside and asked if he had an "attitude." Taylor then took the inmate to another room and told him that the gum was contraband and that, because he received the gum, his visiting privileges could be cancelled for six months. Taylor informed Lieutenant Vanessa Ward about the contraband and she, in turn, notified Captain Timothy McNeil, who approved terminating the inmate's visit. Ward directed Taylor and Howard to strip search the inmate and then return him to his cell.

Taylor and Howard took the inmate to a search room. While there, the inmate touched a patch on Taylor's sleeve. Taylor responded by pushing the inmate twice against the wall. Howard watched as this happened.

Ward recalled that she heard the inmate yelling for help and then saw Taylor and Howard leave the room grinning. She inquired of them what had happened and they both responded, "The inmate is crazy." Taylor and Howard did not fully complete the strip search, although the inmate had removed his clothes.

Ward went into the search room, and the inmate told her that he had been assaulted. Before Ward entered the room, Taylor and Howard neither informed her that they had not completed the strip search nor that the inmate had assaulted Taylor.

Ward later attempted to inform Taylor of the inmate's allegation of assault. Taylor, however, interrupted her and walked away. He was then relieved of his post. Subsequently, in Ward's office, Ward informed Taylor of the inmate's allegation and "counseled" him for his previous insubordination.

Taylor and Howard submitted official reports concerning the incident, in which they failed to mention that the strip search was not fully completed and that Taylor pushed the inmate against the wall. Taylor wrote two Notices of Infraction, charging the inmate with insolence, possession of contraband, disobeying a direct order, and assault. At an adjust-

ment hearing concerning these charges, on July 24, 1991, the inmate was found guilty of insolence and possession of contraband, but not guilty of assault and disobeying a direct order.[1]

On July 26, 1991, Security Chief Ralph Logan held suspension hearings for Howard and Taylor.[2] The hearings, held separately, focused on the officers' failure to properly perform a strip search, failure to secure the inmate after the inmate had allegedly assaulted Taylor, and failure to warn Lieutenant Ward that the inmate had been assaultive before she entered the strip search room. Both officers were suspended for three days for a second category infraction described as "[i]nattentiveness or negligence in the performance of duty by an employee directly responsible for the custody of inmates." DCR 50–2.III.E.2.a.19. Specifically, Logan found that the officers had violated DCR 50–2.II.J., which states:

"An employee of the Agency shall be responsible for his/her own actions as well as the proper performance of his/her duties. An employee shall perform his/her duties in a manner which will maintain the highest standards of efficiency in carrying out the functions and objectives of the Agency in accordance with established policies and procedures. Unsatisfactory performance may be demonstrated by a lack of knowledge, unwillingness or inability to perform assigned tasks, failure to conform to work standards established for the member's rank, grade, or position, or failure to take appropriate action to ensure compliance with Agency regulations."

At the hearing, Lieutenant Ward, in the course of relating the general sequence of events, mentioned the inmate's allegation of assault. The record, however, does not reflect any attempt to substantiate or investigate the allegation at that

---

1. Taylor also filed a sworn statement with the Somerset County Court Commissioner, in which he alleged that the inmate had assaulted him.

2. The report of this incident did not reach Warden Kenneth Taylor until July 24, 1991, four days after the incident. Captain McNeil was suspended for three days for failing to report the incident according to the proper procedures.

time.  Rather, it reveals that on the day before the hearings, Warden Taylor referred the incident to the Investigative Unit, where the case was assigned to Corporal Harry Edwards of the Maryland State Police.[3]

Edwards began his investigation on July 26, 1991, by speaking to Howard and attending Howard's suspension hearing. Also on that day, he interviewed the inmate concerning the incident.  On July 29, along with Chief Logan and Sergeant Cynthia Komenda from the Maryland State Police, Edwards again interviewed the inmate, who repeated his account of the incident without discrepancies.

After the interview, Edwards conferred with Logan, who had spoken to Taylor, Howard, Ward and some other witnesses.  Logan told Edwards that he believed the inmate's account of the incident.  Also on July 29, Edwards discovered that Taylor had made a sworn application for a criminal summons to be issued for the inmate.

On July 30, Edwards interviewed Ward and received her version of the events.  On that day, he interviewed Lieutenant J. Gumpman.  On August 1, he interviewed the inmate's daughter, who had been visiting her father when the incident occurred.  On August 5, he interviewed Captain McNeil and two prisoners who were in the visiting room at the time of the incident.

According to Edwards, the entire investigation was completed by August 15, 1991.  He concluded that Taylor had committed the assault and battery and had filed false reports.  He also concluded that Howard witnessed the assault and battery, yet failed to properly report it and failed to truthfully answer questions about it.

On November 15, 1991, Edwards forwarded a typed copy of the report to his commander for review.  He testified that this report was delayed because his time was consumed with other

---

3.  The regulations require that certain major infractions be reported to the investigative unit, including the use of excessive force and violations of the criminal law.

investigations. On January 17, 1992, the report was forwarded to Warden Taylor, on February 20, 1992, to Assistant Commissioner Mazzone, and on April 30, 1992 back to Warden Taylor. Both Warden Taylor and Assistant Commissioner Mazzone determined that the findings in the report should be sustained.

Charges for removal were filed against both Howard and Taylor on June 9, 1992. Howard was charged with violating the department's rules on performance of duties, personal conduct, prevention of disorders, breach of security, false reports, and attitude towards inmates.[4] He was also charged with violating COMAR 06.01.01.47, paragraphs D, E, L and M, which state that the following are sufficient causes for removal:

"D. That the employee has violated any lawful official regulation or order or failed to obey any lawful and reasonable direction given by his superior officer when the violation or failure to obey amounts to insubordination or serious breach of discipline which may reasonably be expected to result in a lower morale in the organization or to result in loss or injury to the State or the public;

E. That the employee has been wantonly offensive in his conduct toward fellow employees, wards of the State, or the public;

L. That the employee has willfully made a false official statement or report;

M. That the employee has been guilty of conduct such as to bring the classified service into public disrepute."

In addition to the violations with which Howard was charged, Taylor was charged with violating the department's rule on the use of force and COMAR 06.01.01.47, paragraph B, which establishes as sufficient cause for removal "[t]hat the employee has been wantonly careless or negligent in the performance of his duty or has used unwarrantable or excessive force in his

---

4. The rule on performance of duties is quoted above. The other rules are reproduced in the appendix to this opinion.

treatment of public charges, fellow employees, or other persons."

Howard and Taylor appealed the charges for removal to the Office of Administrative Hearings. The appeals were consolidated for a hearing on July 21 and July 28 of 1992 before an ALJ. The ALJ found the facts, outlined above, concerning the incident and concluded that the charges for removal should be sustained against both Howard and Taylor. He also considered and rejected arguments from the officers that the charges were barred by double jeopardy and that the charges should be dismissed because of the delay between the incident and the filing of the charges. On February 3, 1993, a designee of the Secretary of Personnel adopted the proposals of the ALJ and ordered that Howard and Taylor be separated from their positions.

The officers filed actions for judicial review in the Circuit Court for Somerset County. The cases were consolidated for a hearing on March 22, 1994. The judge ruled that the Agency's removal of the officers violated double jeopardy principles. He also concluded that the removals were defective because the investigation had grossly exceeded the 90–day period provided for in the regulations.[5] Accordingly, he reversed the decisions of the Secretary of Personnel. The Agency appealed to the Court of Special Appeals. While the cases were pending there, we granted certiorari to consider the issues raised.

## III.

### A.

Howard and Taylor assert that the Agency has both suspended and removed them for the same incident. They maintain that the Agency's actions are contrary to a principle

---

**5.** The Division of Correction's regulation lists, as a responsibility of the investigative unit, to "[e]nsure internal investigations are completed within 90 days of receipt or first knowledge of the allegation or incident." DCR 50–2.VI.A.2.d.

they call "administrative double jeopardy," which they have extrapolated from the principle of administrative law that an agency cannot act arbitrarily and capriciously.

While in their brief to this Court Howard and Taylor have abandoned the argument that the Agency violated principles of constitutional double jeopardy, we will nevertheless discuss the viability of that argument because it formed the basis for one of the circuit court's two holdings. The court stated that the suspension "was a penalty, the purpose of the penalty to change the job performance of the employees, but a penalty to accomplish that result nonetheless." It characterized the removal as "an additional penalty imposed in addition to one that had been imposed back very shortly after the incident occurred." The court then concluded: "[I]t appears to be a double jeopardy situation involved in state employment service."

In *Ward v. Department of Public Safety and Correctional Services*, 339 Md. 343, 663 A.2d 66 (1995) [No. 10, September Term, 1995, filed August 21, 1995], consolidated for argument with the present cases, we discussed *U.S. v. Halper*, 490 U.S. 435, 440, 109 S.Ct. 1892, 1897, 104 L.Ed.2d 487 (1989), in which the United States Supreme Court decided that the Double Jeopardy Clause protects against multiple punishments even if the punishment is labeled "civil." The Court stated that "the determination whether a given civil sanction constitutes punishment in the relevant sense requires a particularized assessment of the penalty imposed and the purposes that the penalty may fairly be said to serve." *Id.* at 448, 109 S.Ct. at 1901. The Court determined that if the purpose of the penalty is retribution or deterrence, it is punishment, but, if the purpose of the penalty is remedial, it is not punishment. Applying this test in *Ward*, we stated:

"[T]he disciplinary sanctions imposed under regulation 50–2 are remedial in nature, not punitive. The Division of Correction, like any employer, must maintain control over its employees. To this end, the Division has established standards of conduct and published them to its employees. The standards would have no meaning, force or effect if there

were no penalty for their violation. Thus, the Division has established a system of progressive discipline. Common sense dictates that this discipline is imposed to ensure that employees adhere to the established standards of conduct. Indeed, the forward to the regulation states that "discipline shall be progressive in nature and, in combination with specific training, shall aim at correcting inappropriate employee behavior." Because the discipline is not imposed for the purpose of punishment, the principles of double jeopardy simply do not apply."

339 Md. at 350, 663 A.2d 66.

■ Howard and Taylor argue that it is inherently arbitrary and capricious for the Agency to suspend and remove an officer based on the same incident. We need not reach this issue, however, because they were not suspended and removed for the same incident. As we see it, the charges for removal were based on facts that were different, and entirely more serious, than the facts upon which the suspensions were based. Thus the Agency's decision to file charges for removal against the officers was not arbitrary and capricious. As the record discloses, the suspension hearing concerned the officers' failure to properly secure and search the inmate, as well as their failure to warn Lieutenant Ward that the inmate was potentially violent. In contrast, the investigation that led to the removal of the officers focused on the much more serious allegations of assault, battery, and false reports.

Howard and Taylor argue that the removal decision was arbitrary because all the evidence concerning the assault and false reports was available at the time of the suspension hearings and no new evidence was discovered after that time. Their argument ignores the fact that the investigation into the more serious matters began on the same day as the suspension hearings, July 26, 1991, and continued through August 15, 1991, the majority of it occurring after the hearings. During this time, Edwards was able to collect and evaluate information concerning the incident. The officers' argument fails to take into account the time needed for such collection and

evaluation of information. Taken to its logical end, the argument would require the Agency to either forego the suspensions entirely or "rush to judgment" on the removal decisions. A decision to remove a classified employee is a serious matter that should be done only after adequate investigation and deliberation. It is unreasonable to believe that such a decision could have been made, in these cases, between July 24 when the warden was informed of the incident and July 25 when the suspension hearings occurred.

On the other hand, requiring the Agency to forego the suspensions would unnecessarily interfere with the its proper discipline of its employees. The warden must begin any disciplinary suspension within two days of the time he learns of the incident. COMAR 06.01.01.46.A. He could not wait, in this case, for a full report from the Investigative Unit to take action on the less severe infractions that he knew the officers had committed. Therefore, it was not unreasonable for the warden to impose suspensions for those infractions, while at the same time referring the incident to the Investigative Unit and eventually imposing more severe discipline for more serious infractions not considered at the suspension hearings.[6]

### B.

As an alternate ground for his decision, the circuit court judge ruled that the removal of the officers must be reversed because the investigation took too long—in his words, a "gross violation of the 90 day investigatory period." He was referring to the Division of Correction's regulation that lists, as a responsibility of the investigative unit, to "[e]nsure internal

---

6. Part III.E of regulation 50–2 establishes three categories of disciplinary infractions. Category one infractions are the least severe, and category three infractions are the most severe. The suspensions of Howard and Taylor were the required discipline for category two infractions. DCR 50–2.III.E.2.b. The warden filed the charges for removal when an investigation revealed that Howard and Taylor had also committed category three infractions. The regulation specifically lists "unnecessary force" as an example of a category three infraction, and provides that these infractions "shall result in termination from State service." DCR 50–2.III.E.3.a.6 & b.

investigations are completed within 90 days of receipt or first knowledge of the allegation or incident." DCR 50–2.VI.A.2.d. His understanding, however, of this provision—as a time limit for the institution of charges—is incorrect.

When interpreting regulations, we "generally employ the same rules applicable to the interpretation of statutes." *Chesapeake v. Comptroller,* 331 Md. 428, 440, 628 A.2d 234 (1993). The primary goal of statutory construction is to determine and effectuate the Legislature's intention. *E.g., Oaks v. Connors,* 339 Md. 24, 660 A.2d 423 (1995); *Baltimore v. Cassidy,* 338 Md. 88, 93, 656 A.2d 757 (1995). The words of the provision are the primary indicator of legislative intent. *Tidewater/Havre de Grace, Inc. v. Mayor of Havre de Grace,* 337 Md. 338, 345, 653 A.2d 468 (1995). In examining the words, however, we must look at the entire statutory scheme, not just the individual provision. *Outmezguine v. State,* 335 Md. 20, 41, 641 A.2d 870 (1994). We must also consider the purpose of the statute. *Blaine v. Blaine,* 336 Md. 49, 69, 646 A.2d 413 (1994). Moreover, "we seek to avoid constructions that are illogical, unreasonable, or inconsistent with common sense." *Frost v. State,* 336 Md. 125, 137, 647 A.2d 106 (1994).

Applying these principles to the regulation containing the 90 day provision, we conclude that it does not create a fixed time frame in which the warden must file charges for removal. The language of the regulation clearly indicates that it is not the decision to file charges for removal that must be completed in 90 days; rather it is the "internal investigation" that must be completed. Indeed, the regulation is not even directed at the entity responsible for filing charges for removal; while charges for removal are filed by the appointing authority—the warden in this case—the investigation is conducted by the investigative unit, which is directly responsible to the Commissioner of Correction, not to the warden. Moreover, the regulation does not make the 90 days a mandatory directive; rather, the regulation simply lists it, among other things, as a "responsibility" of the investigative unit.

■

■ The standard under which we must judge the actions of the Agency, therefore, is not whether it rigidly adhered to a time frame, but whether it acted arbitrarily and capriciously. While the ten month period between the incident and charges for removal was less than ideal, it did not make the Agency's decision to remove the officers arbitrary and capricious. The record reveals that the decision was the product of careful deliberation by the warden and the assistant commissioner and was based on a thorough investigation by the Investigative Unit involving numerous witnesses. While the handling of the case was somewhat delayed, it progressed steadily through the system, being considered first by the Investigative Unit, thereafter by the warden, and finally by the assistant commissioner.

Moreover, the record does not reflect any prejudice to the officers that was caused by the delay. They were not suspended pending the investigation. They have not pointed to any witnesses whose memory has faded or who has become unavailable. They argue, without citing specific examples, that they have been prejudiced because witnesses' memories have faded and evidence has become stale. Ten and a half months, however, is not an extraordinary length of time to preserve evidence. Indeed, the general statute of limitations for misdemeanors, including battery, is a full year. Code (1974, 1995 Repl.Vol.), § 5–106(a) of the Courts and Judicial Proceedings Article.

*JUDGMENTS OF THE CIRCUIT COURT FOR SOMER-*
*SET COUNTY REVERSED; CASE REMANDED TO THAT*
*COURT WITH DIRECTIONS TO AFFIRM THE ORDER*
*OF THE ADMINISTRATIVE AGENCY. COSTS TO BE*
*PAID BY RESPONDENTS.*

*Appendix: Relevant Portions of DCR 50–2, § II*

B.  Personal Conduct:

1.  Each employee shall conduct him/herself at all times, both on and off duty, in such a manner as to reflect most favorably on the Agency. Any breach of the peace, neglect of duty, misconduct or any conduct on the part of any employee

of the Agency, either within or outside of his/her place of employment, which tends to undermine the good order, efficiency, or discipline of the Agency, or which reflects discredit upon the Agency or any employee thereof, or which is prejudicial to the efficiency and discipline of the Agency, even though these offenses may not be specifically enumerated or stated, shall be considered conduct unbecoming an employee of the Agency, and subject the employee to disciplinary action by the Agency.

2. An employee while acting in his/her official capacity, may not use any coarse, profane or insolent language and/or take action towards other employees, supervisors, inmates or members of the public that is considered offensive to contemporary community standards, except as required as part of an approved inmate treatment program.

\* \* \* \* \* \*

10. An employee may not intentionally violate any state, federal or local law....

\* \* \* \* \* \*

K. Insubordination

1. An employee shall promptly obey all lawful orders of a superior or person designated to supervise.

\* \* \* \* \* \*

L. Prevention of Escape and Disorders

It is the duty of an employee to take all reasonable means to prevent escapes or disorders. An employee having information about an unusual institutional occurrence, an escape, a disturbance, a violation of an institutional directive or Agency regulation or any other matter affecting the security or safety of an institution shall immediately report the information orally to his/her immediate supervisor and submit a written report as soon as possible.

M. Breach of Security

An employee may not take any action or fail to take any action when the action, or failure to act causes a breach of

security or a potential breach of security by jeopardizing or placing at risk:

1. The physical security or integrity of an institution, or the physical security or integrity of any part or area of an institution or

2. The safety or security of any employee, inmate, visitor or member of the public.

\* \* \* \* \* \*

S. Reports

An employee of the Agency may not knowingly make any false oral or written statement or misrepresentation of any material fact, under any circumstance, with the intent to mislead any person or tribunal. Reports submitted by employees shall be clear, concise, factual and accurate. A clear distinction shall be made between reports which contain false information and those which contain inaccurate or improper information. A false report is one which is intentionally untrue, deceptive or made with the intent to deceive the person to whom it was directed. Inaccurate or improper information may be characterized by that which is untrue by mistake or accident and made in good faith after exercise of reasonable care.

\* \* \* \* \* \*

X. Attitude Towards Inmates

An employee shall be fair, firm and impartial in relationships with inmates. The employee shall maintain a humane, objective and professional interest in the welfare of inmates in order to contribute to the success of the rehabilitative programs of the institution.

Y. Use of Force

1. An employee may not strike or use physical force upon an inmate or any other person, except in self-defense, defense of another employee, member of the public, or inmate, to prevent an escape or serious disturbance or to control an unruly inmate who refuses to obey a lawful order.

2.  An employee shall be firm and resolute, and if he/she is resisted, he/she may repel force with force, using only such force as is necessary to take the individual into custody and/or gain control of the situation.