*Baltimore City Detention Center v. Michael Foy*, No. 3, September Term, 2018

**STATE CORRECTIONAL OFFICERS' BILL OF RIGHTS — PENALTY INCREASE MEETING — PROCEDURAL REQUIREMENTS —** The State Correctional Officers' Bill of Rights, under Maryland Code, Correctional Services Article § 10-910(b)(6)(ii), provides that prior to increasing the hearing board's recommended penalty for a correctional service officer, the appointing authority must afford the officer an opportunity to be "heard on the record." The Court of Appeals held that the appointing authority's failure to comply with this requirement due to the inadvertent malfunctioning of recording equipment is curable by remanding the case to the appointing authority to facilitate another meeting on the record. The thirty-day deadline for issuing a final order, codified at Maryland Code, Correctional Services Article § 10-910(b)(1)(ii), does not preclude this result because Respondent suffered no prejudice from this defect, and the appointing authority acted in good faith to rectify it.

Circuit Court for Baltimore City
Case No. 24-C-16-000255
Argued: September 7, 2018

<u>IN THE COURT OF APPEALS</u>
<u>OF MARYLAND</u>

No. 3

September Term, 2018

_____

BALTIMORE CITY DETENTION CENTER

v.

MICHAEL FOY

_____

Barbera, C.J.,
Greene
*Adkins
McDonald
Watts
Hotten
Getty,

JJ.

_____

Opinion by Barbera, C.J.

_____

Filed: November 19, 2018

*Adkins, J., now retired, participated in the
hearing and conference of this case while an
active member of this Court; after being recalled
pursuant to the MD. Constitution, Article IV,
Section 3A, she also participated in the decision
and adoption of this opinion.

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document * authentic.



Suzanne C. Johnson, Acting Clerk

This case involves the State Correctional Officers' Bill of Rights (hereinafter "COBR"), codified in Title 10, Subtitle 9 of the Maryland Code (1999, 2017 Repl. Vol.), Correctional Services Article.[1] In particular, we must evaluate the interplay between §§ 10-910(b)(1) and 10-910(b)(6). Section 10-910(b)(1) provides that "[w]ithin 30 days after receipt of" the hearing board's recommended penalty, "the appointing authority shall . . . issue a final order." Section 10-910(b)(6) states that "the appointing authority may increase the recommended penalty" if, among other things, the appointing authority "meets with the [charged] correctional officer and allows" the officer "to be heard on the record."

The ultimate question posed here is whether § 10-910(b)(1) precludes remanding a case to the appointing authority to cure a procedural defect that occurred at the penalty-increase meeting. Specifically, we must decide whether the appointing authority should have the opportunity to hold another penalty-increase meeting after the thirty-day deadline for issuing a final order when, as happened here, recording equipment malfunctioned during the initial meeting, preventing the substance of that meeting from being captured "on the record." A three-member panel of the Court of Special Appeals, in a split decision, held that the appointing authority's failure to satisfy the "on the record" requirement is incurable after the thirty-day deadline. *Foy v. Baltimore City Det. Ctr.*, 235 Md. App. 37 (2017). We reach a different conclusion and, consequently, reverse the judgment of the Court of Special Appeals.

---

[1] Unless otherwise indicated, all statutory references herein are to the Correctional Services Article of the Maryland Code (1999, 2017 Repl. Vol.).

# I.

## The COBR Statutory Scheme

Resolution of the parties' dispute turns largely on the proper interpretation and application of the COBR's disciplinary process, so we begin with some background on the enactment of the COBR and a review of the pertinent statutory framework.

The COBR became effective October 1, 2010. *See* State Correctional Officers' Bill of Rights, Ch. 194, 2010 Md. Laws 1425, 1448. Prior to that date, the disciplinary process for state correctional officers was governed by Title 11 of the Maryland Code (1993, 2015 Repl. Vol), State Personnel and Pensions ("SPP") Article. The intent of the then-new COBR was "to establish exclusive procedures for the investigation and discipline of a correctional officer for alleged misconduct." § 10-902. The General Assembly modeled the COBR after the Law Enforcement Officers' Bill of Rights ("LEOBR").[2] *Ellsworth v. Baltimore Police Dep't*, 438 Md. 69, 91 n.20 (2014). Courts therefore look to the LEOBR as an informative source for interpreting the COBR's provisions. *See, e.g.*, *Kearney v. France*, 222 Md. App. 542, 544 (2015).

The COBR's disciplinary process is straightforward. After receiving a notice of charges recommending termination, a correctional officer has the option to file an appeal with the Secretary of the Department of Public Safety and Correctional Services

---

[2] The Law Enforcement Officers' Bill of Rights (referred to as "LEOBR" throughout) is a law enforcement officer's "exclusive remedy in matters of departmental discipline." *Coleman v. Anne Arundel Cty. Police Dep't*, 369 Md. 108, 122 (2002) (citation omitted). The LEOBR provides "certain procedural safeguards[, including notice and an opportunity to be heard,] to law enforcement officers during any investigation . . . that could lead to disciplinary action, demotion, or dismissal." *Id.*

("Secretary") or request a hearing before a hearing board. § 10-908(c). The hearing board is composed of correctional officers holding varying ranks within the Department of Public Safety and Correctional Services ("Department"). § 10-909(c)(1)(i). After facilitating a hearing, the hearing board issues a finding of guilty or not guilty and produces a written penalty recommendation. § 10-910(a)(1)-(7).

The hearing board must deliver this report to the "appointing authority of the correctional facility." § 10-910(a)(9)(ii). The "appointing authority" is defined under § 10-901(b) as "an individual . . . that has the power to . . . terminate employment."[3] The appointing authority of the Baltimore City Detention Center is the Commissioner of the Division of Pretrial Detention and Services ("Commissioner"). § 5-202(c)(4).

After receiving the hearing board's decision, the Commissioner has thirty days to issue a final order. § 10-910(b)(1)(ii). The Commissioner is not bound by the hearing board's recommended penalty. § 10-910(b)(3). If the Commissioner determines that termination of the employee is appropriate, then the Commissioner "shall obtain approval from the Secretary." § 10-910(b)(5). The Commissioner may also increase the hearing board's recommended penalty, with the Secretary's permission, if the Commissioner: (1) reviews the record of the hearing board's proceedings; (2) meets with the correctional officer and allows the officer an opportunity to be heard on the record; (3) provides the officer with any items not included in the hearing board's record that the Commissioner

---

[3] Section 10-901(b) relies on the definition of "appointing authority" as provided in SPP § 1-101(b).

3

relied on; and (4) describes, in writing, the evidence supporting his decision to increase the recommended penalty. § 10-910(b)(6). Once the Commissioner issues a final order, the correctional officer has a right to seek judicial review. § 10-911.

## II.

## The Present Case

Lieutenant Michael Foy ("Foy"), Respondent here, sought judicial review of the decision of Acting Commissioner of the Baltimore City Detention Center, John Wolfe ("Commissioner Wolfe") to terminate him for reasons we next explain.

### A. *The Underlying Incident*

On January 12, 2014, Foy and Sergeant Jeremiah Green ("Green"), both correctional officers at the Baltimore City Detention Center ("BCDC"), Petitioner, were conducting security rounds at the facility. At some point during their rounds, an altercation ensued between Green and an inmate, during which Green struck the inmate in the face. The inmate then charged at Green, but Green restrained him. Although the inmate posed no further threat, Foy stepped on his neck, placing the inmate in need of medical care. After the incident, Foy did not report his use of force. Foy ultimately submitted a report, but he omitted material facts about the incident.

### B. *The Disciplinary Proceedings*

On April 10, 2014, the Department's Human Resources Services Division served Foy with a Notice of Disciplinary Charges ("Notice"). The Notice charged Foy with violating twelve Department policies, as enumerated by various statutes, regulations, and

internal guidelines and recommended his termination. On April 16, 2014, Foy exercised his right to a hearing, as provided by the COBR. § 10-908(c)(2).

The hearing board conducted a three-day hearing (on September 14, October 5, and October 12, 2015), during which it heard testimony from witnesses called by both BCDC and Foy. On November 16, 2015,[4] the hearing board issued a written decision finding Foy guilty of ten of the twelve disciplinary charges. The hearing board recommended that he be transferred to Baltimore City Booking and Intake Center and demoted to Sergeant.

On November 23, 2015, Commissioner Wolfe received the hearing board's recommendation and, as authorized by § 10-910(b)(6), elected to increase the recommended penalty. On December 9, 2015, Commissioner Wolfe conducted a penalty-increase meeting, as required by § 10-910(b)(6)(ii), with Foy and his attorney. During the meeting, Foy's counsel argued that Commissioner Wolfe should not increase the hearing board's recommended penalty.

After the meeting, Commissioner Wolfe learned that the audio recording equipment had failed; consequently, the meeting was not "on the record," as per § 10-910(b)(6)(ii). The next day, December 10, 2015, Commissioner Wolfe informed Foy's counsel about the recording issue and requested that the parties reconvene for another meeting. That same day, Commissioner Wolfe created a memorandum for the Secretary of Public Safety and

---

[4] The hearing board's decision is dated Friday, November 13, 2015, but the Court of Special Appeals found that the "disciplinary action would not take effect . . . until 16 November 2015, the following business day." *Foy*, 235 Md. App. at 57 n.15. Because the parties seemingly have adopted November 16, 2015 as the date for the hearing board's decision, we use that date throughout this opinion.

5

Correctional Services, Stephen T. Moyer, memorializing what transpired at the December 9th meeting. The memorandum noted, among other things, that Foy asked for his ten years of service to be considered. Foy also requested leniency and an opportunity for a second chance, stating, as recounted by the Commissioner, that "if he was given the opportunity to do it all over again, he would have made different choices."

The parties were set to meet again on December 17, 2015, but Commissioner Wolfe canceled without explanation on December 16, 2015. Thereafter, Commissioner Wolfe, with Secretary Moyer's approval, issued a final order terminating Foy, effective December 16, 2015.

Foy filed a petition for judicial review in the Circuit Court for Baltimore City. There, he argued that Commissioner Wolfe violated his rights under the COBR because the Commissioner increased the hearing board's recommended punishment without properly recording the penalty increase meeting. Foy requested that the court vacate the termination order and reinstate him with back pay. After a hearing, the court issued an order remanding the case to Commissioner Wolfe to conduct another penalty-increase meeting "so that a complete record of the administrative proceeding is available for . . . [j]udicial [r]eview."

C. The Appeal

Foy noted an appeal to the Court of Special Appeals. A panel of the Court of Special Appeals, in a 2-1 decision, reversed the circuit court's remand order and "reinstate[d] the Hearing Board's penalty recommendation as the final administrative action." *Foy*, 235

Md. App. at 44.[5]  The Majority, relying on cases interpreting similar provisions of the LEOBR, concluded that the COBR's requirements for increasing the hearing board's recommended penalty are mandatory, *Hird v. City of Salisbury*, 121 Md. App. 496, 504 (1998), and, as such, any failure to satisfy those obligations was incurable after thirty days, *VanDevander v. Voorhaar*, 136 Md. App. 621, 632 (2001).  *Foy*, 235 Md. App. at 68.  The Court of Special Appeals therefore held that the "[f]ailure to comply timely with the requirements of Corr. Servs. § 10-910(b)(6) closed the window of opportunity for the appointing authority to increase Foy's penalty beyond that proposed by the Hearing Board."  *Id.*  Judge Deborah Eyler dissented, arguing that the text of the COBR and the cases relied upon by the Majority did not support such a rigid result.  *Foy*, 235 Md. App. at 74 (Eyler, J., dissenting).  Judge Eyler was of the view that remanding the case to hold another penalty-increase meeting was the proper remedy given the "technical nature of the failure here and the lack of any prejudice to Foy."  *Id.* at 76.

On March 6, 2018, we issued a writ of certiorari, *Baltimore City Det. Ctr. v. Foy*, 457 Md. 660 (2018), to analyze the interplay between §§ 10-910(b)(1) and 10-910(b)(6)(ii) and determine whether the Court of Special Appeals erred in holding that the recording issue here was incurable once the thirty-day deadline had passed.

---

[5]  The Court of Special Appeals also rejected BCDC's motion to dismiss, holding that the circuit court's remand order was an appealable final judgment.  *Foy*, 235 Md. App. at 43-44.  BCDC does not challenge that holding here.

## III.

### Standard of Review

The crux of the issue before us is not whether the merits of Commissioner Wolfe's termination order are supported by substantial evidence, but rather whether the penalty-increase process denoted in the COBR is obligatory, and, if so, whether the failure to satisfy one of its steps can be cured retrospectively given the statute's time-restrictive language. These are "purely legal question[s]" involving statutory construction, which we review *de novo*. *Coleman v. Anne Arundel Cty. Police Dep't*, 369 Md. 108, 122 (2002).

The parameters of statutory construction are well defined. Our ultimate objective is to ascertain "the real intention of the Legislature." *Fisher v. E. Corr. Inst.*, 425 Md. 699, 706 (2012) (quoting *In re Gloria H.*, 410 Md. 562, 579-80 (2009)). We start by looking at the statute's plain language, "reading the statute as a whole to ensure that no word . . . is rendered [meaningless]." *Lowery v. State*, 430 Md. 477, 490 (2013) (quoting *Doe v. Montgomery Cty. Bd. of Elections*, 406 Md. 697, 712 (2008)). "If the plain language of the statute is . . . unambiguous, the process ends," *Fisher*, 425 Md. at 706 (quoting *Breslin v. Powell*, 421 Md. 266, 287 (2011)), and we "apply the statute as written," *Carven v. State Ret. & Pension Sys. of Md.*, 416 Md. 389, 407 (2010) (quoting *Crofton Convalescent Ctr., Inc. v. Dep't of Health & Mental Hygiene*, 413 Md. 201, 216 (2010)).

If, however, the statute's words are ambiguous, then we utilize additional sources to aid our analysis, including "legislative history, prior case law, statutory purpose and statutory structure." *Fisher*, 425 Md. at 707 (citation omitted). "Throughout this process,

8

we avoid constructions that are illogical[,] nonsensical[,]"or overly stringent. *In re J.C.N.*, 460 Md. 371, 391 (2018) (citation omitted).

## IV.

## Discussion

While we concur with much of the well-written and thorough Majority opinion of the Court of Special Appeals—specifically regarding the trigger event for initiating the thirty-day timeframe under § 10-910(b)(1) and the obligatory nature of the procedural steps enumerated in § 10-910(b)(6)—we ultimately agree with the dissent that the proper outcome here is to remand this case to Commissioner Wolfe to hold another penalty-increase meeting with Foy.

### A. *Trigger for the Thirty-Day Deadline*

We start by addressing a matter no longer in dispute, that is, when the thirty-day deadline set forth in § 10-910(b)(1) begins. We agree with our colleagues on the Court of Special Appeals that the clock for the Commissioner's issuance of a final order begins to run when the Commissioner receives the hearing board's recommendations.[6] One need only look to subsections (a) and (b) of § 10-910 to reach this conclusion. Section 10-

---

[6] Until the Court of Special Appeals issued its decision, the parties misunderstood when the timeframe for issuing a final order began to run, assuming, incorrectly, as the circuit court did, that the clock started running upon the issuance of the hearing board's decision, rather than when the appointing authority receives that decision. The uncertainty likely arose from the language in *VanDevander*, which suggested that the trigger date for commencing the thirty-day timeline was the date that the hearing board issued its decision. *See VanDevander*, 136 Md. App. at 630. The Court of Special Appeals has since corrected that assumption in a well-reasoned manner and neither party has contested the issue on appeal before us.

910(a)(9) states, in relevant part, "[a] copy of the [hearing board's] decision . . . shall be *delivered* . . . promptly to . . . the [Commissioner]." (Emphasis added). The ensuing subsection, § 10-910(b)(1), states, in pertinent part, "[w]ithin 30 days after *receipt*" of the hearing board's recommendations, the Commissioner "shall . . . issue a final order." (Emphasis added); *see also Black's Law Dictionary* 1459 (10th ed. 2014) (defining "receipt" as "taking physical possession" of an object). When reading these provisions together, as we must, it is clear that "receipt" in § 10-910(b)(1) refers to the Commissioner's receipt of the hearing board's decision under § 10-910(a)(9). *See In re J.C.N.*, 460 Md. at 392 (illustrating that the canons of statutory construction require reading a statute's provisions together and not in isolation, particularly when they are part of the same section). Only when the Commissioner has received the hearing board's decision— i.e., is in actual physical possession of it—does the thirty-day countdown begin.

This conclusion is further supported by the fact that only the Commissioner can issue a final order, § 10-910(b)(2), and to do so, he or she must first satisfy various procedural requirements. *See* § 10-910(b). We agree with the Court of Special Appeals that if the clock for the thirty-day deadline began to run when the hearing board issued its decision, "[i]t would result in a diminished 30-day window" for the Commissioner to satisfy these obligations, as there is an inevitable delay between when the hearing board issues its recommendations and when the appointing authority receives those recommendations. *Foy*, 235 Md. App. at 60. Accordingly, Commissioner Wolfe's final order, which he issued twenty-three days after receiving the hearing board's recommendation, was timely.

10

*B. Obligatory Nature of the Penalty-Increase Process*

BCDC and Foy disagree about whether the procedural steps in § 10-910(b)(6) are obligatory. Foy argues that every pre-condition is mandatory—"[e]very step must be taken" before a penalty is increased. Foy cites to the Court of Special Appeal's decision in *Hird* to support his assertion. 121 Md. App. at 504 (holding that until the appointing authority satisfied every pre-condition for increasing the hearing board's penalty, any increase is "not validly taken and [cannot] be final").

BCDC takes a different approach. It highlights the contrast between the language describing the LEOBR's penalty-increase process and the COBR's analogous provision. The LEOBR states that the head of the law enforcement agency ("the chief") "may increase the recommended penalty of the hearing board *only if* the chief *personally*" satisfies four requirements. Md. Code, (2003, 2011 Repl. Vol), § 3-108(d)(5) of the Public Safety ("Pub. Safety") Article (emphasis added). The corresponding COBR section is phrased identically, except that the words "only" and "personally" are omitted. *See* § 10-910(b)(6). This exclusion, BCDC contends, is "consequential" because it demonstrates the legislature's "rejection of LEOBR's strict, restrictive language." BCDC concludes that, unlike the LEOBR, the COBR does not mandate strict compliance with the penalty-increase process.

We agree with Foy. The canons of statutory construction lead to the same result under both statutes: the appointing authority must satisfy all the procedural steps before issuing a penalty increase.

11

The omission in § 10-910(b)(6) of the word "personally" is insignificant. The statute provides that only the appointing authority has the power to increase a correctional officer's penalty, § 10-910(b)(2), and only the Commissioner of the Division of Pretrial Detention Services is designated as the appointing authority for BCDC, § 5-202(c)(4). Because there is only one Commissioner, it follows that only he or she can "personally" increase a penalty under the COBR. § 5-202(a) (stating that the "Secretary shall appoint *a* Commissioner of Pretrial Detention Services") (emphasis added).

We are similarly unconvinced that exclusion of the word "only" has any significance. What matters in statutory construction is not the uniformity of similarly-worded statutes, but rather the plain language of the statute before us. *See Fisher*, 425 Md. at 706. The plain language of § 10-910(b)(6) states:

> [T]he appointing authority may increase the recommended penalty of the hearing board **if** the appointing authority**:**
>
> (i) reviews the entire record of the proceedings of the hearing board;
>
> (ii) meets with the correctional officer and allows the correctional officer to be heard on the record;
>
> (iii) at least 10 days before the meeting, discloses and provides in writing to the correctional officer any oral or written communication not included in the record of the hearing board on which the decision to consider increasing the penalty is wholly or partly based; **and**
>
> (iv) states on the record the substantial evidence on which the appointing authority relied to support the increase of the recommended penalty.

(Emphasis added).

Three aspects of this provision illustrate its obligatory nature. First, the legislature's use of the word "if" restricts the Commissioner's ability to issue a penalty increase until

12

certain conditions have occurred. *See If*, Oxford English Dictionary, http://www.oed.com/view/Entry/91152 [https://perma.cc/7LWU-7KLT] (last visited Nov. 19, 2018) (defining "if" as "[i]ntroducing a clause of condition"). Second, that restriction is followed by a colon, which introduces a list, meaning the list specifies the preconditions for increasing a penalty. *See* The Chicago Manual of Style ¶ 6.63 (15th ed. 2003). Finally, that list is connected by an "and," signifying that the Commissioner must satisfy each item in the list to issue a penalty increase. *See* Maryland Style Manual for Statutory Law, Department of Legislative Services (July 2008) at 19.[7] The items in the list therefore together constitute a condition precedent for increasing the hearing board's recommended penalty, and only when that condition precedent is satisfied, does the Commissioner possess the authority to increase the penalty. *See Fraternal Order of Police, Montgomery Cty. Lodge No. 35 v. Mehrling*, 343 Md. 155, 177 (1996) (citation omitted) ("Where a statute establishes a condition precedent for action authorized to be taken by an agency, the agency action may not validly be taken until that condition has been met.").

---

[7] We note that, in certain contexts, the word "and" and "or" can be used interchangeably within a statute. *SVF Riva Annapolis LLC v. Gilroy*, 459 Md. 632, 643 (2018) (citation omitted) ("'[A]nd' and 'or' may be used interchangeably when it is reasonable and logical to do so." (alteration in original)). What matters is how those words logically relate to the rest of the statutory scheme. *Id.* at 643 n.6. In this context, since each item in the list builds off the preceding one, it is only logical that "and" requires all the items denoted therein to be satisfied before a recommended penalty is increased.

*C. Relationship Between the Obligatory Penalty-Increase Process and the Thirty-Day Deadline*

BCDC and Foy additionally dispute whether the thirty-day deadline and the penalty-increase process are interrelated. BCDC asserts that the thirty-day limit for issuing a final order and the penalty-increase process are separate and should not be read together as requiring the Commissioner to complete the penalty-increase process within thirty days. To support this claim, BCDC notes that "[t]he 30-day limit appears in a separate subparagraph . . . § 10-910(b)(1), which precedes the penalty-increase process and pertains exclusively to the issuance of the final [order]." The relevant subsection, § 10-910(b)(6), pertaining to penalty increases does not include any time constraints for completing that process.

Foy counters that all aspects of the penalty-increase process must be satisfied within thirty days. Foy directs us to the statute's structure. He notes that § 10-910(b) specifies what the appointing authority must do before issuing a final order, which includes satisfying the penalty-increase prerequisites, if the Commissioner elects to increase the hearing board's recommend penalty. It would be peculiar, Foy claims, to read these provisions separately, as it would result in the Commissioner issuing a final order that he can then change, at his discretion, through the penalty-increase process.

We again agree with Foy. When reading the COBR, the story it seeks to tell speaks for itself. Its sections flow naturally together. There is no disconnect. Interpreting it requires nothing more than a careful reading.

14

These principles run true for the sections at issue here. They cannot be read in isolation; they must be read together as part of the overall process for issuing a final order. *Emps.' Ret. Sys. v. Dorsey*, 430 Md. 100, 113 (2013) (quoting *Gardner v. State*, 420 Md. 1, 9 (2011)) ("[W]e 'do not read statutory language in a vacuum . . . . Rather, the plain language must be viewed within the context of the statutory scheme to which it belongs[.]'"). Section 10-910(b) dictates the process for issuing a final order. The subsection starts by prescribing the timeline, thirty days, § 10-910(b)(1)(ii), and then proceeds to outline what the Commissioner can or must do within that timeframe. For example, before issuing a final order, the Commissioner must review the hearing board's report, § 10-910(b)(1)(i); consider the officer's past job performance, § 10-910(b)(4); and, if the Commissioner seeks to terminate an officer or otherwise increase the penalty recommended by the hearing board, obtain approval from the Secretary, § 10-910(b)(5)-(6).

Section 10-910(b)(6) fits naturally within this scheme. The increased penalty constitutes the final agency action. *See Hird*, 121 Md. App. at 504. Logically, then, the procedural prerequisites prescribed therein must occur within thirty days.

The legislative history of the COBR further illustrates that the General Assembly intended for the thirty-day deadline to apply to the penalty-increase process. *See Morris v. Prince George's County*, 319 Md. 597, 604 (1990) (stating that with statutory interpretation, "we are not limited to [the] study of the statutory language" in that we can "consult[] legislative history as part of the process of determining the legislative purpose"). The first reading of the bill would have made the hearing board's decision final and require

15

that the Secretary issue a final order implementing that decision within five days after receiving it. *See* State Correctional Officers' Bill of Rights, S.B. 887, §§ 10-909(b) and 10-909(c) (2010) (as reported during the first reading on February 15, 2010). Section 10-910 of the proposed bill pertained solely to judicial review; it did not require the Commissioner to satisfy any procedural requirements prior to issuing a final order. *Id.*

In subsequent amendments, the General Assembly revamped the disciplinary process by adding § 10-910(b), as it exists today. *See* State Correctional Officers' Bill of Rights, S.B. 887 (2010) (as passed on April 5, 2010). These changes—allowing thirty days for a final order to be issued, not five, and including a penalty-increase process in the same section that lists all the tasks the appointing authority must complete before issuing a final order—demonstrate that the legislature intended to give the appointing authority time to contemplate the proper sanction, including whether an increase was warranted, although such time was not to exceed thirty days.

We hold, based on the plain language of the COBR and the supporting legislative history, that upon receipt of the hearing board's recommendations, the appointing authority has thirty days to render a final disciplinary decision. § 10-910(b)(1)(ii). In rendering that decision, the appointing authority has discretion to adopt the hearing board's penalty recommendations or to deviate from them. § 10-910(b)(3). If the appointing authority decides to deviate by increasing the recommended penalty, then he or she must satisfy the procedural requirements enumerated in § 10-910(b)(6). All of those procedures must be completed within thirty days. Had the General Assembly sought to extend the timeline for issuing a final order when the Commissioner invokes his or her penalty-enhancement

16

authority, it would have included such an exception in the statute. *See Gomez v. Jackson Hewitt, Inc.*, 427 Md. 128, 155-56 (2012) (cautioning courts against creating exceptions that are not specifically enumerated in the statute).

*D. The Commissioner's Compliance with the Penalty-Increase Process*

We now turn to whether Commissioner Wolfe complied with § 10-910(b)(6). BCDC argues that Commissioner Wolfe was in full compliance—he reviewed the hearing board's report, met with Foy and his counsel, allowed Foy to present his case, and memorialized Foy's statements in a memorandum that constitutes a written record of what occurred at the meeting. BCDC further contends that the malfunction of the recording equipment is inconsequential because the COBR does not require the penalty-increase meeting to be audio recorded. Foy responds that the COBR, in fact, requires the meeting to be audio recorded and that, either way, Commissioner Wolfe's memorandum does not constitute the "record" as prescribed in the COBR. Neither party is entirely correct.

"On the record" is not defined in the statute. *See* § 10-901. When that is the case, and we are called upon to interpret a term, we may consult a dictionary and give words their ordinary meaning. *Montgomery County v. Deibler*, 423 Md. 54, 67 (2011) (quoting *Chow v. State*, 393 Md. 431, 445 (2006)) ("[I]t is proper to consult a dictionary or dictionaries for a term's ordinary and popular meaning[.]"). "The ordinary understanding of the phrase 'on the record' is in writing *or* recorded so as to be capable of being reduced to writing[.]" *Hird*, 121 Md. App. at 503 n.1 (emphasis added); *see also Black's Law Dictionary* 1123 (8th ed. 2005) (defining "on the record" as "recorded as official evidence of a proceeding . . . intended for quotation or attribution"). We envision

17

that the requirement that the penalty-increase meeting be "on the record," can be satisfied in multiple ways, including, but not limited to: (1) using a stenographer to produce a verbatim transcript, (2) using video-recording equipment that allows for precise transcription at a later date, or (3) using audio-recording equipment that allows for the same result as videotaping. For purposes of § 10-910(b)(6)(ii), the Commissioner must rely on a method—be it the ones specified herein or others not explicitly referenced—that allows for precise and contemporaneous dictation of the meeting's substance.

Commissioner Wolfe's post hoc memorandum does not satisfy the requirement that the penalty-increase meeting be conducted "on the record." The purpose of necessitating a record in administrative proceedings is "not only to inform properly the interested parties of the grounds for the [agency's] decision, but also to provide a basis upon which judicial review may be rendered." *Md. Overpak Corp. v. Mayor and City Council of Baltimore*, 395 Md. 16, 40 (2006) (citation omitted). The memorandum is scant on details. Regardless, no amount of detail or attempt to recount precisely what occurred at such a meeting complies with the requirement of § 10-910(b)(6)(ii) that such meetings be conducted "on the record." *Smith v. State*, 291 Md. 125, 130 (1981) (stating that the purpose of requiring contemporaneous recordings of legal proceedings is to "preserve a correct and precise account of the evidence and rulings at trial, and to assure the ability of courts and of counsel to perform their duties efficiently and completely[,]" all of which is undermined if the record is created post hoc). Accordingly, notwithstanding what we assume were his best efforts to reconstruct the record, Commissioner Wolfe's memorandum failed to satisfy § 10-910(b)(6).

*E. The Appropriate Remedy*

Foy avers that the hearing board's recommended sanctions (transfer and demotion) must stand as his final punishment because the window of opportunity for curing the recording defect has now closed. He claims that Commissioner Wolfe acted in bad faith after discovering the defect and therefore forfeited any rights to redo the penalty-increase meeting. We disagree.

We apply administrative law principles when reviewing actions taken pursuant to the COBR. *See* § 10-909(k) (stating that the Administrative Procedure Act is applicable in the COBR hearings); *see also Montgomery County v. Stevens*, 337 Md. 471, 482 (1995) (applying administrative law principles to the LEOBR). We have held that an agency generally must adhere to procedural rules and "when it fails to do so, its actions will be vacated." *Pollock v. Patuxent Inst. Bd. of Review*, 374 Md. 463, 503 (2003).[8] Not every violation, however, will result in relief for the aggrieved party. *Id.* Relief is only afforded after "prejudice . . . [is] shown." *Id.* at 504; *see also Bd. of Physician Quality Assurance v. Levitsky*, 353 Md. 188, 206 (1999) (holding that an agency's violations of procedures that do not "compromise the accused's opportunity for a full and fair hearing on the charges," do not warrant invalidating the agency's decision); *Dep't of Pub. Safety and Corr. Serv. v.*

---

[8] This concept is formally known as the "*Accardi* doctrine," which the Supreme Court articulated in *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954), and we adopted, with modifications, in *Pollock*, 374 Md. at 503. The doctrine's scope helps inform our analysis here regarding the appropriate remedy for an agency's failure to comply with a mandatory procedural rule.

19

*Howard*, 339 Md. 357, 370 (1995) (holding that an agency's failure to abide by the regulation's timeline for finalizing an investigation did "not reflect any prejudice . . . that was caused by the delay").

We have defined "prejudice" as "anything [that] places the person affected in a more unfavorable or disadvantageous position than he would otherwise have occupied." *Motor Vehicle Admin. v. Shrader*, 324 Md. 454, 470 (1991) (quoting *Roberto v. Catino*, 140 Md. 38, 44 (1922)). Foy fails to satisfy this standard. Recording or no recording, the hearing board found Foy guilty of two charges that in the view of the appointing authority, warrant automatic dismissal. *See* § 10-901(g)(11) (incorporating SPP § 11-105(1), which mandates termination for "intentional conduct, without justification, that . . . seriously threatens the safety of the workplace[,]" and utilizing "unwarrantable excessive force [against] . . . a . . . prisoner"). Foy offers no evidence that the outcome here would be different if the penalty-increase meeting had been properly recorded. He references no statements made at the meeting that would lead us to believe the Commissioner overlooked material information when rendering his decision. Nor does he dispute the accuracy of Commissioner Wolfe's memorandum summarizing that meeting.[9]

---

[9] At oral argument, counsel for Foy asserted that Foy need not contest the accuracy of the Commissioner's memorandum because the Commissioner's failure to comply with the COBR's procedural mandates *per se* warrants vacating the Commissioner's final order. Such a holding—that a procedural defect alone entitles an aggrieved party to relief— contradicts our well-established precedent on such issues, and so we reject its application to the COBR disciplinary process. *See Kelly v. State*, 392 Md. 511, 550 (2006) (quoting *Lawson v. State*, 389 Md. 570, 580 (2005)) (noting that "[A]n error by the trial court does not warrant reversal 'unless that error is both manifestly wrong and substantially injurious'"); *see also Bradley v. Hazard Tech. Co.*, 340 Md. 202, 208 (1995)

20

Moreover, unlike the Sheriff in *VanDevander*, who essentially ignored each of the mandatory steps for increasing the hearing board's recommended penalty, *Foy*, 235 Md. App. at 74 (Eyler, J., dissenting), Commissioner Wolfe satisfied all but one of those requirements and acted in apparent good faith to correct the one he missed by drafting the memorandum, notifying Foy's counsel, and working to reschedule the meeting.

Commissioner Wolfe's failure to obtain a waiver from Foy and his unexplained cancellation of the rescheduled meeting were not, as Foy contends, actions taken in bad faith. Foy theorizes that, upon discovering the recording defect, Commissioner Wolfe proceeded with the blatant intent to disregard the COBR's mandates. That is not what the record indicates. In the absence of any indication to the contrary, we are satisfied that Commissioner Wolfe reasonably believed, especially given the lack of a clear definition for "on the record," that his memorandum satisfied § 10-910(b)(6)(ii) and, accordingly, he did not seek a waiver. Similarly, although Commissioner Wolfe should have provided Foy with an explanation for cancelling the rescheduled meeting, his failure to do so does not suggest bad faith, on this record. *See Rite Aid Corp. v. Hagley*, 374 Md. 665, 681 (2003) (defining bad faith as "a state of mind affirmatively operating with a furtive design"). At the time, both parties were operating under the mistaken belief that the deadline for issuing a final order was to occur before the rescheduled meeting, a mistake which explains Commissioner Wolfe's sudden cancellation. *See Foy*, 235 Md. App. at 70 (Eyler, J., dissenting) ("In all likelihood, the Commissioner cancelled the December 17, 2015 meeting

(holding that an incomplete transcript by itself does not merit a new trial unless the individual harmed demonstrates that the error was significant).

21

because, like everyone else, he thought it would be beyond the 30-day deadline for issuing a final decision."). Put simply, Commissioner Wolfe acted reasonably under the circumstances. Moreover, his actions did not run afoul of the relevant provisions of the COBR.

In sum, when all the smoke is cleared, Foy's claim rests on "a single, technical failure . . . that can easily be cured" with a remand that allows the "Commissioner to hold another meeting with Foy with a properly operating tape recorder." *See Foy*, 235 Md. App. at 74 (Eyler, J., dissenting); *see also Holiday Spas v. Montgomery Cty. Human Relations Comm'n*, 315 Md. 390, 400 (1989) ("Thus a court can remand . . . [to cure] a procedural error at the administrative level[.]").

## V.

### Conclusion

In closing, our holding should not be read to stand for the proposition that the appointing authority has discretion to decide which procedures to abide by when engaging in the penalty-increase process. On the contrary, the statute's purpose makes clear that the appointing authority must protect the due process rights of a charged correctional officer by adhering to all the enumerated procedures. Nor should this case be construed by the appointing authority as license to disregard intentionally one or more of the required procedures, as doing so *could be* grounds for precluding a remand to cure a defect outside the thirty-day timeframe, but that is not before us in this case. Here, we hold, based on the record before us, that the proper remedy for the unforeseen technological glitch, which

22

occurred at the initial penalty-increase meeting and resulted in no prejudice to Foy, is that

the parties must reconvene for another meeting to be held on the record.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED, WITH THE INSTRUCTION THAT THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY BE AFFIRMED. COSTS TO BE PAID BY RESPONDENT.**